**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**September 18, 2006**

Charles R. Fulbruge III
Clerk

REVISED SEPTEMBER 21, 2006

UNITED STATES COURT OF APPEALS
For the Fifth Circuit

---

No. 03-30875

---

COLISEUM SQUARE ASSOCIATION, INC.,
SMART GROWTH FOR LOUISIANA,
LOUISIANA LANDMARKS SOCIETY, INC.,
HISTORIC MAGAZINE ROW ASSOCIATION
and THE URBAN CONSERVANCY, INC.

Plaintiffs-Appellants,

VERSUS

ALPHONSO JACKSON, ETC; ET AL

Defendants,

ALPHONSO JACKSON, ACTING SECRETARY,
U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
and HOUSING AUTHORITY OF NEW ORLEANS

Defendants-Appellees

- - - - - - - - - - - - - - - - - - - - - - -

---

No. 04-30522

---

COLISEUM SQUARE ASSOCIATION, INC.,
SMART GROWTH FOR LOUISIANA,
LOUISIANA LANDMARKS SOCIETY, INC.,
HISTORIC MAGAZINE ROW ASSOCIATION
AND THE URBAN CONSERVANCY, INC.

1

Plaintiffs-Appellants,

VERSUS

HOUSING AUTHORITY OF NEW ORLEANS,
an agency of the State of Louisiana,
ALPHONSO JACKSON, ACTING SECRETARY,
UNITED STATES DEPARTMENT OF HOUSING
AND URBAN DEVELOPMENT,

Defendants-Appellees

VERSUS

HISTORIC RESTORATION, INC.,

Intervenor-Appellee

---

Appeals from the United States District Court
for the Eastern District of Louisiana

---

Before JONES, Chief Judge, and KING and DENNIS, Circuit
Judges.

DENNIS, Circuit Judge:


    In this case, we are called upon to decide whether
the National Environmental Policy Act of 1969 (NEPA), 42
U.S.C. §§ 4321-4370f), and the National Historic
Preservation Act (NHPA), 16 U.S.C. §§ 470f-470x-6,

require the United States Department of Housing and Urban Development (HUD) to cease federal funding for the St. Thomas Housing Development revitalization project in the City of New Orleans until the agency completes further evaluation of the project's environmental and historic preservation impacts. Because it does not appear that HUD has acted arbitrarily, capriciously or contrary to law in its study, consideration, and findings regarding the project's environmental impacts, we conclude that these statutes impose no further requirements on HUD at this time.

## I.

A brief overview of the statutes and regulations creating the administrative framework, terminology and objectives helps to understand the case. After describing the bureaucratic order, we then turn to the factual and procedural background.

### A.

3

1.

"NEPA establishes a 'national policy [to] encourage productive and enjoyable harmony between man and his environment,' and was intended to reduce or eliminate environmental damage and to promote 'the understanding of the ecological systems and natural resources important to' the United States." Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 756 (2004) (quoting 42 U.S.C. § 4321). "'NEPA itself does not mandate particular results" in order to accomplish these ends."' Pub. Citizen, 541 U.S. at 756 (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989)). Instead, NEPA imposes procedural requirements on federal agencies, requiring agencies to analyze the environmental impact of their proposals and actions. Pub. Citizen, 541 U.S. at 756-57. NEPA's central requirement is that federal agencies must:

> include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on-(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be

implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of longterm productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2); see also Pub. Citizen, 541 U.S. at 757.

Federal agencies receive guidance in their preparation of this detailed "Environmental Impact Statement", or "EIS", from the Council of Environmental Quality ("CEQ"). Established by NEPA with the authority to issue regulations interpreting that statute, the CEQ has promulgated regulations determining what actions are subject to that statutory requirement. See 40 C.F.R. § 1500.3; see also Pub. Citizen, 541 U.S. at 757. According to these regulations, the agency may instead prepare a more limited document, called an Environmental Assessment ("EA"), if the proposed action is categorically excluded from the requirement to produce an EIS or does not clearly require the production of an EIS. Pub. Citizen, 541 U.S. at 757 (citing 40 C.F.R. §§ 1501.4(a),(b)). An

EA, as compared to an EIS, should be a "concise public document...that serves to...[b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS]." 40 C.F.R. § 1508.9(a). "If, pursuant to the EA, an agency determines that an EIS is not required under applicable CEQ regulations, it must issue a 'finding of no significant impact' (FONSI), which briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment." Pub. Citizen, 541 U.S. at 757 (citing 40 C.F.R. §§ 1501.4(e), 1508.13).

2.

"The National Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 470-470x-6, 'requires each federal agency to take responsibility for the impact that its activities may have upon historic resources, and establishes the Advisory Council on Historic Preservation...to administer the Act.'" Nat'l Mining Ass'n v. Fowler, 324 F.3d 752, 755 (D.C.Cir. 2003) (citations omitted). Section 106 of

6

the NHPA requires that:

> [t]he head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking...shall, prior to the approval of the expenditure of any Federal funds..., take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation established under Title II of this Act a reasonable opportunity to comment with regard to such undertaking.

16 U.S.C. § 470f.

Like NEPA, the NHPA is procedural in nature. See, e.g., Morris County Trust for Historic Pres. v. Pierce, 714 F.2d 271, 278 (3d Cir. 1983).

> It does not itself require a particular outcome, but rather ensures that the relevant federal agency will, before approving funds or granting a license to the undertaking at issue, consider the potential impact of that undertaking on surrounding historic places. As such, courts have sometimes referred to Section 106 as a "stop, look, and listen" provision.

Business and Residents Alliance of East Harlem v. HUD, 430 F.3d 584, 591 (2d Cir. 2005) (citing Ill. Commerce Comm'n v. Interstate Commerce Comm'n, 848 F.2d 1246, 1260-61 (D.C.Cir.1988); Pres. Coal., Inc. v. Pierce, 667

F.2d 851, 859 (9th Cir. 1982)). Much like the EA/EIS process under NEPA, section 106 upholds the NHPA's objectives "neither by forbidding the destruction of historic sites nor by commanding their preservation, but instead by ordering the government to take into account the effect any federal undertaking might have on them." United States v. 162.20 Acres of Land, 639 F.2d 299, 302 (5th Cir. 1981).

When a project will adversely affect a National Historic Landmark, however, section 110f of the NHPA requires an agency to "undertake such planning and actions as may be necessary to minimize harm to such landmark" to the maximum extent possible and to allow the Advisory Council on Historic Preservation ("ACHP") time to comment. 16 U.S.C. § 470h-2f. "Federal regulations also have been promulgated to guide the historic preservation review process, including consultation with the [State Historic Preservation Officer, or "SHPO"] and an opportunity to comment by the [ACHP]." Vieux Carre Property Owners Residents and Associates, Inc. v. Pierce,

719 F.2d 1272, 1281 (5th Cir. 1983) (citing to 36 C.F.R. §§ 800-100.13).

B.

1.

We now turn to the factual and procedural background of this case. The plaintiffs, Coliseum Square Ass'n, Inc., Smart Growth For Louisiana, Louisiana Landmarks Society, Inc., Historic Magazine Row Association, and The Urban Conservancy, non-profit organizations representing citizens, residents and merchants in the City of New Orleans ("plaintiffs"), brought this action against HUD for judicial review, seeking declaratory judgment that HUD failed to comply with NEPA and NHPA in funding the St. Thomas Housing Development revitalization project and an injunction compelling HUD to withhold federal funds from the project until it fully complies with those statutes. The Housing Authority of New Orleans ("HANO") was originally a named defendant. Although the district court granted plaintiffs' motion to dismiss HANO from the

case as a defendant, HANO later re-entered the case as an intervenor.

The St. Thomas Housing Development revitalization project calls for substantial demolition of the pre-existing St. Thomas Housing Development (St. Thomas) in New Orleans and, in its place, the construction of new low-income housing, new market rate housing, a senior care facility, and a shopping center. Prior to the beginning of the project, St. Thomas was a residential public housing complex within the Lower Garden District of New Orleans. Both the Garden District itself and many of the buildings in St. Thomas are listed on the National Register for Historic Places. St. Thomas, built between 1937 and 1949, consisted of 121 buildings (a total of 1510 residential units) covering 64 acres. By 1994, St. Thomas had become excessively run-down and crime-ridden. The Housing Authority of New Orleans initiated renewal efforts, which resulted in a plan to renovate the area covered by St. Thomas.

In 1996, HUD granted the Housing Authority of New

Orleans $25 million through the HOPE IV program for revitalizing St. Thomas; the project then did not contemplate retail stores but was limited to housing units. Because of its grant of federal funds, HUD became responsible for ensuring that its financing of the revitalization project complies with the requirements of NEPA and NHPA.

In 1998, HANO enlisted a private developer, Historic Restorations, Inc. ("Historic Restorations") to assist in improving the plan. An amended redevelopment plan, submitted to HUD in 2000, included construction of new low-income housing, new market rate housing, a senior care facility, and a 275,000 square foot shopping center, the last of which was to be built on nearby, formerly industrial land. Historic Restorations hired Citywide Testing ("Citywide") to prepare environmental studies and documents for the project. By November 4, 1999, Citywide had completed studies and proposed findings for HUD in support of a proposed FONSI.

By September 2000, HUD completed the initial Section

106 review required by the National Historic Preservation Act ("NHPA"), which examined the project's impact on historical properties. Subsequently, the Housing Authority of New Orleans, the State Historical Preservation Officer, and the Advisory Council on Historic Preservation (a federal agency) signed a Memorandum of Agreement ("MOA") for the project. Demolition began in October 2000.

HUD also completed its NEPA review in May of 2001, after reviewing and adopting the proposed EA developed by Citywide and approved by HANO: after adopting the proposed EA/FONSI, HANO forwarded it to HUD. On May 21, 2001, the acting HUD officer noted, by hand and in the space provided, that HUD had reviewed and concurred in the proposed EA/FONSI.

In July 2001, after both the MOA and environmental assessment were completed, Historic Restorations recommended that the retail component of the project be scaled back from 275,000 square feet to 199,000 square feet and obtained a commitment from Wal-Mart to become

the retailer.

On September 4, 2001, after HRI publicly announced that Wal-Mart would be filling the retail space, the State Historic Preservation Officer asked to reopen the NHPA review. On September 6, 2001, all parties to the MOA agreed to reopen the NHPA process. HUD then undertook additional study, including a particular focus on the potential impact Wal-Mart might have on historic properties in the area. The additional investigation included consultation with all of the MOA's signatories as well as with the City of New Orleans and its planning commission, the State of Louisiana, the general public (including St. Thomas residents), and the project's opponents (including neighborhood groups and preservation agencies). As a result of that study, HUD expanded its assessment of the project's Area of Potential Effects to cover parts of Uptown, Mid-City, and Faubourg Marigny as well as all of the Garden District, the Lower Garden District, Irish Channel, the Central Business District, and the Vieux Carre (better known as the French Quarter).

In July 2002, two years after demolition had begun and the project's residents had been relocated, plaintiffs filed suit. In response to the concerns raised in that complaint, HUD reopened its NEPA process to conduct further study. While the process was open, progress on the project was restricted to infrastructure work on the residential sections and work needed to address environmental conditions. After the supplemental investigation was complete, the proposed EA and FONSI went through a public comment period. On February 20, 2003, an amended MOA was signed and a new environmental assessment and FONSI were issued.

## 2.

At oral argument we requested additional briefs from the parties regarding whether the case had been mooted because the project was either substantially complete or effectively terminated by the adverse effects of Hurricane Katrina. After reviewing those briefs, we are satisfied that this case is not moot and that we have

subject matter jurisdiction.

It is true that many significant parts of the project have been completed. The Wal-Mart shopping center has been finished and open for business since late 2004. As of late February 2005, most of the former St. Thomas housing project had been demolished. Only five buildings were left standing for future rehabilitation. The first phase of housing units had been completed; 98% of them had been rented and occupied. Infrastructure work for the entire housing portion of the site had been completed, and work had begun on ten subsidized units of offsite rental housing.

The next phase, however, consisting of the construction of 73 mixed-income housing units, was expected to begin in March 2006. Work had not yet begun on rehabilitating the remaining five buildings from the St. Thomas housing project. The following construction was planned but not yet begun: 200 mixed-income rental units, 64 affordable rental housing units for the elderly, a 250-unit market rate rental retirement

community, and 200 market rate condominium units; additional small-scale commercial ventures, which may be included in some of the new residential construction; and construction or rehabilitation of affordable rental housing (90 units) and affordable individually owned houses (50 units). Hurricane Katrina generally spared the existing housing units, and they are currently habitable. HANO indicates that it plans to finish the project, but it has not determined how Hurricane Katrina's impact might change the its prior plans.

The plaintiffs in the present case challenge far more than the building demolition called for by the project. Despite the completion of the Wal-Mart complex and other edifices, significant projected construction and renovation remain unfinished. Plaintiffs' requested relief – declaratory judgments invalidating the existing MOA as well as the environmental assessment and FONSI, plus injunctions halting construction and requiring preparation of a proper and legal MOA and environmental assessment – could, if granted, eliminate or alleviate a

multitude of their expressed environmental and historical preservation concerns. Accordingly, we conclude that the case is not moot and proceed to consider the merits of the plaintiffs' claims. <u>Cf</u>. <u>Benavides v. Housing Authority of City of San Antonio, Tex.</u>, 238 F.3d 667, 670 (5th Cir. 2001) (holding a demolition project to be moot where demolition was only 55% complete, but had progressed to the point where units were no longer habitable); <u>Bayou Liberty Ass'n v. U.S. Army Corps</u>, 217 F.3d 393 (5th Cir. 2000) (holding the case to be moot where construction of the project had been entirely completed); <u>Vieux Carre Property Owners, Residents, & Assoc., Inc. v. Brown</u>, 948 F.2d 1436, 1446 (5th Cir. 1991) ("as long as...[the agency] has the ability to require changes that could conceivably mitigate any adverse impact the project might have...[the project] remains a federal undertaking and NHPA review is required."). None of the parties to this suit contend that Hurricane Katrina's effects have rendered the project moot.

An agency's decision not to prepare an EIS can be set aside only upon a showing that it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Marsh v. Or. Natural Res. Council, 490 U.S. 360, 375-376 (1989); Kleppe v. Sierra Club, 427 U.S. 390, 412 (1976). Here, HUD based its FONSI upon the analysis contained within its EA; respondents argue that the issuance of the FONSI was arbitrary and capricious because the EA's analysis was flawed for numerous reasons that we address individually later in this opinion.[1]

---

[1] On April 11, 2003, in ruling on cross-motions for summary judgment, the district court concluded that HUD's environmental assessment/FONSI and MOA were not "arbitrary and/or capricious in any respect." Plaintiffs contend that the district court erred in this ruling: that HUD arbitrarily and capriciously concluded that the project would result in no significant environmental impact.

Our review of the district court's ruling on the cross-motions for summary judgment is de novo, "applying the same standard on appeal that is applied by the district court." Terrebonne Parish Sch. Bd. v. Mobil Oil Corp., 310 F.3d 870, 877 (5th Cir. 2002) (citing Auguster v. Vermilion Parish Sch. Bd., 249 F.3d

Under NEPA, an agency is required to provide an EIS only if it will be undertaking a "major Federal actio[n]," which "significantly affect[s] the quality of the human environment." 42 U.S.C. § 4332(2)(C). Under applicable CEQ regulations, a "[m]ajor Federal action" is defined to "includ[e] actions with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18. "Effects" are defined to "include: (a) [d]irect effects, which are caused by the action and occur at the same time and place," and "(b) [i]ndirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." Id. § 1508.8. It is undisputed that HUD's funding of the project is a major federal action. Thus, we must determine whether HUD acted reasonably and in accordance with law in deciding, based on its EA and FONSI, that its action had no direct or indirect effects that

400, 401 (5th Cir. 2001)). Here, like the district court, we apply the "arbitrary and capricious" standard described above.

19

significantly affected the quality of the human environment. See Pub. Citizen, 541 U.S. at 763-4.

Plaintiffs first argue that HUD's action in funding the project was not in accord with law in two respects: they assert that federal regulations automatically required HUD to produce an EIS based on the increased level of noise and the sheer number of dwellings affected by the project. In their remaining arguments, plaintiffs contend that HUD acted arbitrarily and capriciously or unreasonably because the evidence available to HUD mandated preparation of an EIS.

### A.

Plaintiffs contend that CEQ regulations required HUD to prepare an EIS under the facts established by its own EA, and that HUD's major federal action of funding the project before preparing an EIS was not in accordance with law. Contrary to plaintiffs' argument, however, HUD's interpretation and application of the regulations as permitting it to proceed without an EIS in this case

were not arbitrary, capricious, or clearly contrary to law. When the interpretation and application of regulations by an agency and its opponents are not arbitrary and capricious nor clearly contrary to law we are required by NEPA and the Supreme Court's decisions to accept the agency's decision as being in accordance with law. See, e.g., N. Ind. Pub. Serv. Co. v. Porter County Chapter of Izaak Walton League of America, Inc., 423 U.S. 12, 15 (1975)).

HUD regulation 24 C.F.R. §§ 51.104(b)(2) requires the agency to prepare an EIS prior to approving "projects with unacceptable noise exposure[,]" that is, where sound levels reach 75 decibels or greater, based on a 24-hour weighted average of sound levels. See 24 C.F.R. §§ 51.104(b)(2).[2] In its FONSI, HUD stated that the project is in compliance with noise abatement requirements, noting that the sound measurements fall within

_____

[2] HUD regulations define "Acceptable" noise levels as "not exceeding 65 dB[,]" "Normally Unacceptable" levels as "[a]bove 65 dB but not exceeding 75 dB[,]" and "Unacceptable" levels as "[a]bove 75 dB." 24 C.F.R. § 51.103, table.

"acceptable" levels. In doing so, HUD relied on a September 2002 noise survey included in its EA which indicates that the noise exposure (the average day-night sound level at the site) reaches 60 decibels, within the "acceptable" range. Review of that study indicates that it used measurements taken over a 24-hour period within a carefully described area, and included an assessment of the possible effects of future increased traffic and the construction of retail buildings. Plaintiffs contend that in conducting the study HUD did not comply with its own September 1991 Noise Guidebook.

The fact that HUD's submitted study did not completely comply with the requirements of its Noise Guidebook is not, of itself, sufficient to show that its reliance on the study was not in accordance with law or arbitrary and capricious. In Lyng v. Payne, 476 U.S. 926, 937 (1986), the Supreme Court held that "not all agency publications are of binding force" - in other words, the guidelines in question must be "the kind of agency law the violation of which is remediable at all." Generally,

22

to be legally binding on an agency, its own publications must have been "promulgated pursuant to a specific statutory grant of authority and in conformance with the procedural requirements imposed by Congress." See, e.g., Schweiker v. Hansen, 450 U.S. 785, 789-90, (holding Social Security Administration Claims Manual is not binding agency rule); Fano v. O'Neill, 806 F.2d 1262, 1264 (5th Cir. 1987) (holding INS Operations Instructions not binding because "they are not an exercise of delegated legislative power and do not purport to be anything other than internal house-keeping measures."); W. Radio Servs. Co. v. Espy, 79 F.3d 896, 900-01 (9th Cir. 1996) (holding that the court reviews noncompliance with an agency "pronouncement" only if it "actually has the force and effect of law."); Gatter v. Nimmo, 672 F.2d 343, 347 (3d Cir. 1982) (holding Veteran's Administration publications not binding because they were not promulgated under the APA's rulemaking requirements); Fed. Land Bank in Receivership v. Fed. Intermediate Credit Bank, 727 F.Supp. 1055, 1058 (D.Miss. 1989)

(holding that directive not promulgated according to APA procedure lacks force and effect of law); see also Davis Mountains, 116 Fed. Appx. 3, 9-10 (5th Cir. 2004) (summarizing above case law and holding as result that the Air Force's Handbook is not binding as it was not promulgated according to the APA's procedural requirements). Where agency publications have not been so promulgated, the agency's decision to analyze impacts by other methods is not an automatic violation of the law. As such, it is subject to review under the normal "arbitrary and capricious standard" used to review agency action under the APA. Davis Mountains, 116 Fed. Appx. at 9-10 ("Thus the Air Force retained discretion to analyze impacts on livestock by methods other than those contained in the Handbook, and we must address the adequacy of the Air Force's chosen method according to the arbitrary and capricious standard"); see also Communities Against Runway Expansion, Inc. (CARE) v. F.A.A., 355 F.3d 678, 688 (D.C. Cir. 2004) (holding that even though an executive order mandating agency

24

consideration of environmental justice concerns created no private right of action for an agency's failure to comply with that mandate, the court would review the agency's action as an exercise of discretion under the APA and NEPA). Here, plaintiffs neither argue nor offer evidence that HUD's guidelines were promulgated under the Administrative Procedure Act's procedural requirements. Plaintiffs's first argument therefore fails: HUD has not acted contrary to law by using methodology different from that contained in the Guidebook.

Plaintiffs also argue that HUD "obviously skewed [the study] to measure disproportionally during the quietest times of the day and bring the overall average decibel level down." Similarly, they appear to assert that HUD was arbitrary and capricious in not relying on the results of an extra-record noise survey completed in April 2001 by Citywide. They claim that HUD's chosen methodology improperly and purposely skews the survey results by including a measurement at noon, but no measurements between 7:30 AM and 12:06 PM nor between

25

11:46 AM and 2 PM. They offer conclusory allegations that HUD's sampling survey produces distorted results and was conducted in that manner for the express purpose of avoiding the conclusion suggested by the extra-record Citywide survey.

At best, this argument reflects only a disagreement over whether it was arbitrary and capricious for HUD to base its decision on the study documented in the record rather than extra-record evidence. There is simply no evidence of bad or improper motive by HUD in this instance. Nor do plaintiffs provide further evidence showing either that reliance on such a methodology is otherwise arbitrary and capricious or that HUD's methodology was actually flawed, rather than simply different from plaintiff's preferred method. In fact, the Citywide study on which plaintiffs would urge reliance does not comply with HUD regulations, which the agency must obey, let alone the Noise Guidebook's non-binding requirements.[3] The Citywide survey hardly amounts to

---

[3] As an example, the proffered extra-record survey took its measurements over a 12-hour period; 24 C.F.R.

persuasive evidence of noise levels that require an EIS under the HUD regulations. We may not, therefore, say that HUD arbitrarily and capriciously relied on the study's results in determining that the noise levels did not trigger the automatic environmental impact statement requirement.

Plaintiffs next argue that HUD's funding of the project without preparing an EISs was contrary to a CEQ regulation mandating an EIS when a project will "remove, demolish, convert, or substantially rehabilitate 2,500 or more existing housing units...or...result in the construction or installation of 2,500 or more housing units." 24 C.F.R. § 50.42(b)(2). Plaintiffs argue that this regulatory provision must be read expansively and cumulatively: that is, that each demolition of an old housing unit and each construction of a new housing unit should be counted cumulatively toward the 2,500 limit or trigger. Thus plaintiffs contend that, if a project proposes to destroy 1,250 old units and construct new

---

§ 51.103(a), by contrast, requires measurements over a 24-hour period.

1,250 units in their place, an EIS is required because this would involve the destruction or construction of 2,500 units. HUD reads the regulation as disjunctively establishing two categories: demolition, conversion or rehabilitation of the old vis-à-vis construction or installation of the new; as applied to this case, HUD reasons that, since only 1,510 units are to be demolished or rehabilitated and only 1,282 are to be newly constructed or installed, the project does not reach the 2,500 unit trigger in respect to either category.

Plaintiffs effectively concede this point. They do not argue or attempt to show that HUD's interpretation is arbitrary and capricious. Instead, they contend, without explanation, that we should not defer to the agency's reasonable interpretation as precedent would require, but that we ought to use our own judgment to declare that their interpretation of the regulation will be followed because it is simply the best. Even if we were to agree, however, we do not have the plenary authority to interpret the regulation in this kind of case as we

personally deem best. "In situations in which 'the meaning of [regulatory] language is not free from doubt,' the reviewing court should give effect to the agency's interpretation so long as it is 'reasonable,' that is, so long as the interpretation 'sensibly conforms to the purpose and wording of the regulations.'" Martin v. Occupational Safety & Health Review Comm'n, 499 U.S. 144, 150-1 (1991) (quoting Ehlert v. United States, 402 U.S. 99, 105 (1971) and N. Ind. Pub. Serv. Co. v. Porter County Chapter of Izaak Walton League of America, Inc., 423 U.S. 12, 15 (1975)). Because the plaintiffs effectively concede that HUD's interpretation of the regulation is not unreasonable, we conclude that the regulation does not require an EIS in this case and that HUD did not fail to act in accordance with law in this respect.

B.

The theme of plaintiffs' remaining NEPA arguments is that HUD acted arbitrarily, capriciously, or in abuse of

its discretion by failing to prepare an EIS although it knew or should have known that the reasonably foreseeable effects of the project would significantly affect the quality of the human environment in many different ways. We address each argument under a separate heading. Before we begin, we pause to reiterate that in attacking a decision not to prepare an EIS, "more than an allegation of deficiencies is necessary; the plaintiffs must prove the essential allegations of their complaint by a preponderance of the evidence." La. Wildlife Fed'n, Inc. v. York, 761 F.2d 1044, 1055 (5th Cir. 1985) (Rubin, J., dissenting). "It is the burden of the plaintiffs to adduce evidence, not merely to make allegations or to rest on assumptions, establishing that the Corps was [arbitrary and capricious] in reaching the conclusion it did[.]" Id.

### 1. Environmental Justice

Executive Order 12898 instructs agencies to consider the environmental justice impacts of their actions. Exec.

Order No. 12898, 59 Fed. Reg. 7629 § 6-609 (1994). The Order does not, however, create a private right of action. Thus, we review the agency's consideration of environmental justice issues under the APA's deferential "arbitrary and capricious" standard. See, e.g., Communities Against Runway Expansion, Inc. (CARE) v. F.A.A., 355 F.3d 678, 688 (D.C. Cir. 2004). Leaving aside legalisms, we see in this record no administrative insensitivity to racial or economic inequality. Instead, we see a project that HUD perceived reasonably as a community effort, endorsed initially by some who now oppose it, to renovate a deteriorating public housing project for the ultimate and enduring benefit of the community.

HUD's environmental justice study, completed in September 2002, looked at the area in which the project is being built and determined that those who return to live in the "new" St. Thomas will benefit from safer, more sanitary living conditions and an improved economic environment. It considers the problems of displacement,

including the fact that residents still living in the project would be eligible for relocation under the Uniform Relocation Act. Furthermore, HUD's study reflected that St. Thomas residents had numerous complaints about the housing project and were at risk from pest infestations, asbestos, drug paraphernalia, lead exposure, and raw sewage. It notes, based on the comments received from then-residents, that many had complaints about the St. Thomas development and while some would stay there if conditions and amenities were improved, others would prefer to become home owners outside of the project. Over 200 lawsuits had been filed over lead exposure in the housing units, and that 99% of residents belonged to a minority group.

The record also indicates that HUD received and responded to comments made at a public meeting by Mr. Brod Bagert, whose master's thesis had been highly critical of the HOPE IV program, and of the broader "market revitalization" approach to improving urban areas. His comments and his study use the St. Thomas

project as an example to attack that particular theory of urban planning. HUD responded to Mr. Bagert's comments, indicating that while it understood the basis of his criticism of the HOPE IV approach to urban revitalization, the HOPE IV approach is clearly supported by Congressional mandate.

Plaintiffs offer Mr. Bagert's comments, and evidence of problems with residential relocations under the Uniform Relocation Act, for the proposition that HUD's evaluation of the project's impacts is entirely contradicted by the evidence.[4] The record in front of us is hardly so clear cut, and certainly reveals that HUD gave attention to the issues plaintiffs raise, for all they disagree with the conclusions. Beyond their allegations and Mr. Bagert's comments, which HUD clearly

---

[4] Mr. Bagert's written report is outside the record. The district court denied plaintiffs's request to add it as a supplement to the administrative record. Plaintiffs challenge that ruling by the district court's decision only in response to its ruling on their Rule 59 motion, discussed infra. For the purposes of the immediate analysis, we are confined to the administrative record, which includes only Mr. Bagert's oral comments at a public meeting.

took under consideration, plaintiffs offer no evidence suggesting that the environmental justice study was arbitrary or capricious in its choice of methodology. We cannot, therefore, say that they have met their burden of showing that HUD's consideration of environmental justice concerns was arbitrary and capricious.

## 2. Zoning

The New Orleans City Council approved zoning changes for the project in November 2001 (for the retail portion) and in April 2002 (for the residential portion). In addition, implementing the St. Thomas revitalization project required the creation of a Tax Increment Financing District, which helps fund the project, and which was highly controversial with regard to its possible negative economic effect on local businesses near the project. In preparing the environmental assessment, HUD indicated only that the project was in compliance with local zoning ordinances by the time of the assessment, without indicating that such compliance

actually required changing the local zoning laws. In addition, when describing the two twelve-story residential buildings and the 200,000 square-foot Super Wal-Mart retail center, HUD indicated on the environmental assessment form that the project was compatible with its surroundings in terms of land use, building type, height, bulk and mass, and density.

Plaintiffs challenge HUD's conclusion that local zoning changes implemented for the project do not create a significant environmental impact. First, plaintiffs assert that "[l]ocal zoning changes significantly impact the human environment[;]" but offer little support for their arguments. They offer <u>Sierra Club v. Marsh</u>, 769 F.2d 868, 872 (1st Cir. 1985), for the proposition that an EIS is automatically required where the project radically alters existing land use, but we find that case inapposite. There, the court held that the Federal Highway Administration and Army Corps of Engineers could not support its FONSI by relying on land use regulations to safeguard the land because the project would radically

35

alter land use. Id. Here, although HUD does cite to its compliance with local zoning ordinances as support for its FONSI, we have no change so radical as to be akin to replacing an undeveloped wooded island with a marine terminal and industrial complex, as was proposed in Marsh. Thus Marsh offers us no such legal rule, nor do plaintiffs offer us support for drawing an analogy on the facts. The project in the case at bar, particularly the high-rise structures and the Wal-Mart center, is located on the Tchoupitoulas industrial corridor, and the remaining residential portion borders the nearby residential areas. Without further evidence supporting their allegations, we may not hold that HUD was arbitrary and capricious in determining that the zoning change of itself implied that the project would have a significant impact on the environment.

Second, plaintiffs assert that the implementation of the Tax Increment Financing District was a highly controversial change, such that it requires an environmental impact statement under the regulations set

36

out by the Council on Environmental Quality. <u>See</u> 40 C.F.R. § 1508.27(b) (identifying a project's "highly controversial" nature as a factor to consider in evaluating the intensity of impacts). We have held that these factors listed in the regulation "do not appear to be categorical rules that determine by themselves whether an impact is significant." <u>Spiller</u>, 352 F.3d at 243. "As such, all that would have to be shown is that all the factors were in some way addressed and evaluated; whether this was done in factor-by-factor fashion is irrelevant." <u>Id</u>. Furthermore, "controversial" is usually taken to mean more than some public opposition to a particular use – rather it requires "a substantial dispute...as to the size, nature, or effect of the major federal action." <u>See Center for Biological Diversity v. U.S. Fish & Wildlife Service</u>, 202 F. Supp 2d 594, 657-8 (W.D.Tex. 2002) (summarizing existing case law with regard to what constitutes a "substantial dispute" such that an environmental impact statement is required). Reviewing the record, the portions to which plaintiffs cite clearly

reflect public opposition from local businesses to using the retail space to house a Wal-Mart, but do not attack the broader nature or effect of the project as a whole. The record clearly reflects that HUD addressed and evaluated this factor and plaintiffs do not adduce evidence suggesting that its evaluation was insufficient, but simply assert disagreement with the conclusion. Accordingly, they have not met their burden to show that HUD acted arbitrarily or capriciously.

### 3. Businesses Occupying Historic Buildings

CEQ regulations require agencies to discuss economic factors where interrelated with NEPA environmental considerations; such factors include the impact on "uniqueness of historic resources" and "adverse impacts on National Register properties"). See 40 C.F.R. §§ 1508.14 (requiring examination of interrelated effects), 40 C.F.R. § 1508.27 (list of NEPA intensity factors contributing to the determination of "significant impact" on "uniqueness of historic resources" and "adverse

impacts on National Register properties"). As a result, HUD built into its EA an assessment of the project's impact on businesses occupying historic buildings.[5]

In reaching its FONSI on the issue, HUD relied on a broad range of information, including opinion polls, newspaper articles, and other studies - notably, the Lambert Advisory Report. This last indicates that Wal-Mart will reduce some sales from local businesses, but also suggests that Wal-Mart may actually help the area retain some revenue which had previously left the city in favor of suburban retail. Other documents in the record are equally clear in identifying both the increase in competition posed by Wal-Mart as well as its potential economic benefits to existing retailers. HUD's administrative record also includes an inventory of area businesses (the "Blick inventory"), which is an

---

[5] HUD attempts to argue that even though it did consider this issue, NEPA does not require such a examination of "purely economic" impacts. The merit of this argument is dubious, since, as plaintiffs note, the loss of businesses in the district relates to the amount of money available to maintain historic buildings.

admittedly "quick review" and contains errors, particularly in its characterization of what goods or services varying businesses provide.

Plaintiffs argue that HUD's reliance on the Blick inventory as "sole support" for its statement will not suffice in order to support a FONSI. Although their argument might have carried weight if the Blick inventory was HUD's sole source of information, HUD in fact considered information from a wide range of sources, which led it to conclude that although the Wal-Mart will bring increased competition to the area, adding the business to the area was also likely to result in an increase in economic opportunities for local retailers. Furthermore, plaintiffs simply misstate the record when they assert that HUD entirely ignored the Lambert report. Finally, plaintiffs proffer an alternative, extra-record inventory of local businesses. Beyond simply restating that study's conclusions, which are more favorable to their desired outcome, plaintiffs offer no evidence that would allow us to conclude that its methodology is any

40

more reliable or its results any more robust than the studies HUD included in the administrative record. As a result, we cannot say that plaintiffs have met their burden in showing that HUD acted arbitrarily or capriciously.

4. Toxic and Hazardous Waste

HUD regulations do not permit that agency to approve projects that are not located an acceptable distance from "hazards" unless appropriate mitigation measures are taken. 24 C.F.R § 15.202(a). "Hazards" are defined to include any "any stationary container which stores, handles or processes hazardous substances of an explosive or fire prone nature." 24 C.F.R. § 15.201. Accordingly, HUD's EA included an investigation into whether any such hazards threatened the St. Thomas project as a part of the process. It conducted two Phase I assessments, which identified certain toxic and hazardous waste issues, including both an underground storage tank containing petroleum products and a fuel pump, both located on the

41

Wal-Mart site. A later Phase II assessment recommended methods for remediation, and in mitigation HUD required Historic Renovation, the developer, to set up an escrow account to ensure remediation. The environmental assessment openly discusses the presence of these hazards in the comments to the section on "toxic chemicals and radioactive materials." Those remarks clearly reflect the need for a Phase II assessment, the presence of an underground storage tank, and the remediation requirements. HUD's actions comply with their regulations, and are not arbitrary or capricious in this respect.

Plaintiffs accuse HUD of violating its duty to disclose the existence of an underground storage tank by failing to disclose it in the section of the environmental assessment meant to identify "hazardous industrial operations". Their brief charges that HUD purposely committed deception by not listing the hazards in that section, and did so with the sole purpose of avoiding the preparation of an EIS. They offer no

evidence that HUD's required remediation is insufficient to warrant a FONSI, nor any evidence to support their claims of bad faith. Nor do they offer any legal argument that the hazards must be listed in that specific section of the form, rather than in the location HUD placed it. In fact, the record reflects that the EA clearly reveals that the hazards are present and indicates the remediation planned to reduce the effects of those hazards. As a result, plaintiffs have not made any showing that HUD engaged in purposeful concealment or arbitrarily relied on the remediation measures in reaching its FONSI.

### 5. Lead Contamination

24 C.F.R. § 50.3(i)(1) requires that HUD must ensure its projects are free of "hazardous materials, contamination, toxic chemicals and gasses, and radioactive substances" that would "affect the health and safety of occupants or conflict with with the intended utilization of the property." In doing so, HUD must pay

"particular attention" to industrial sites and other areas containing hazardous waste, using "current techniques by current professionals." 24 C.F.R. §§ 50.3(I)(2), (3). As a part of its EA process, therefore, HUD considered whether the project area had significant lead contamination. We hold that the agency was not arbitrary or capricious in determining that the environmental impact from lead in the soil was not significant.

The agency hired a contractor, PSI, to carry out the Phase II environmental assessment already mentioned above; as a part of that work, PSI took various soil samples. The contractor was particularly concerned with lead in the soil coming from underground storage tanks and old dry-cleaning facilities. When it tested the samples, PSI found that the levels of lead in the soil were below the health-based limit set by the Louisiana Department of Environmental Quality. Based on those results, HUD determined that the environmental impact from lead in the soil was not significant.

HUD later received public comments on its separate environmental justice study from a soil expert, in response to a statement in that study that surface lead contamination in the project was not a problem. The expert stated that his soil surveys for lead contamination in New Orleans found that the St. Thomas community was one of "the most contaminated areas in the city" and "recommended concerted effort" to address the problem. On receipt of those comments, and in light of the PSI results, HUD asked C-K Associates, the contractor that had prepared the environmental justice study, about the effect of those remarks on the EA. C-K Associates responded by saying that although the expert was well-respected in his field, his methodology did not follow the standards HUD required for evaluating lead levels. Given that the PSI tests had shown lead levels below the permissible maximum and that the outside expert's methods did not meet agency requirements, HUD maintained its conclusion that lead contamination at the site was not significant for the purposes of the EA.

Plaintiffs disagree mightily with PSI's technique and clearly prefer the outside expert's methodology, urging that HUD arbitrarily and capriciously relied on PSI's unsound techniques. The mere fact of HUD's reliance on the PSI study is not arbitrary and capricious. We have held that "[an] agency is not required to 'do it alone'" in reviewing the environmental impact of projects, and may employ outside consultants in preparing an environmental assessment. <u>Save Our Wetlands, Inc. v. Sands</u>, 711 F.2d 634, 642 (5th Cir. 1983). "The intent of the controlling regulations is that "acceptable work [completed by parties outside the agency] not be redone[.]" <u>Id</u>. (citing 40 C.F.R. § 1506.5(a)). Furthermore, "an agency must have discretion to rely on the reasonable opinions of its own qualified experts, even if, as an original matter, a court might find contrary views more persuasive." <u>Marsh v. Oregon Natural Res. Council</u>, 490 U.S. 360, 378 (1989); <u>see</u> <u>also</u>, <u>Mississippi River Basin Alliance v. Westphal</u>, 230 F.3d 170, 175 (5th Cir. 2000); Sabine River, 951 F.2d 669, 678

(5th Cir. 1992). An agency may not, however, "reflexively rubber stamp" information prepared by others. <u>Save Our Wetlands, Inc. v. Sands</u>, 711 F.2d 634, 643 (5th Cir. 1983) (citing <u>Sierra Club v. Lynn</u>, 502 F.2d 43, 58-59 (5th Cir.1974)); <u>Sierra Club v. Sigler</u>, 695 F.2d 957 (5th Cir. 1983)).

On this record, we find that plaintiffs have not shown that either HUD's reliance on PSI's study or PSI's methodology were arbitrary and capricious. HUD's administrative record, however, clearly reflects that when public comment called possible flaws in PSI's methods or results, HUD inquired into the problem and, on consideration of the evidence, chose to continue to rely on PSI for sound reasons. In support, plaintiffs can only point to the results of the outside study and the soil expert's comments. As C-K Associates noted, however, HUD could not rely on plaintiffs' preferred method without violating its own standards. Furthermore, the soil expert's comments state only that the project has the highest lead contamination in New Orleans, and do not

contradict PSI's findings that the lead-levels are within of health-based standards. Beyond their allegations and the above comparisons, plaintiffs offer no concrete evidence to support their arguments. Accordingly, we conclude that HUD was neither arbitrary nor capricious in relying on PSI's conclusions in reaching its FONSI.

## 6. Traffic

When studying the project's potential effects, HUD looked at the possible impacts of increased traffic. A September 2001 traffic study examined streets and major intersections in the project - locations where it thought any increase would likely cause problems. A second study, carried out in December 2002, looked at the effect traffic increases would have in areas outside of that already covered by the original study. HUD also carried out noise and vibration studies, and included traffic as a factor in its environmental site assessments, environmental justice study, and mitigation requirements. The New Orleans Department of Public Works and the

Regional Planning Commission also studied traffic impacts and concluded that the effects would not be significant. On the record before us, which includes all of the above, we hold that the agency did not arbitrarily or capriciously reach its FONSI with regard to traffic.

Plaintiffs attempt to whittle away at HUD's support for its findings. They assert that HUD relies solely on the December 2002 study to reach its conclusions. The 2002 study, they allege, covers only outlying areas and therefore cannot, alone, support HUD's determination. Their characterization of the record is simply inaccurate: as recounted above, HUD relied on far more than just that study, and in fact made certain to incorporate traffic effects into its study of other potential impacts as well. Second, plaintiffs urge that the bare fact that HUD predicts a 67% increase in traffic should suffice for any impacts of that traffic to be automatically "significant" for NEPA purposes. will have per se significant effect. They offer us no legal authority for the proposition that a predicted increase

should be considered _de facto_ significant. Moreover, while plaintiffs allege a long list negative effects on health, safety, noise, pollution, vibration, and historic properties, they offer us no evidence as to what those effects would be, why they would be significant, or how HUD has failed to investigate them. In addition, the record described above belies the assertion that these effects have gone unstudied in HUD's EA. As a result, we may not say that HUD's decision was arbitrary and capricious in this regard.

## 7. Cumulative Impacts

Plaintiffs argue, in effect, that HUD should be charged with constructive knowledge of significant foreseeable cumulative effects upon human environment that were discoverable upon reasonable investigation. They beg the question, however, by assuming without demonstrating with concrete supporting evidence that the significant effects they allege were reasonably foreseeable at the time of HUD's EA/FONSI.

The plaintiffs assume that it was reasonably foreseeable to HUD that the project would cause two types of significant environmental effects: 1) future unspecified impacts caused by the influx of additional national retailers attracted by Walmart's presence and 2) future impacts of increased traffic from the above combined with future impacts by three other planned expansions in the area.[6] Although the plaintiffs have not established either the foreseeability or the significance of these effects, we discuss them briefly:

First, NEPA requires HUD to study a project's reasonably foreseeable effects. Plaintiffs' sole allegation is that HUD failed to study the detrimental effects of the eventual arrival of other, unknown national retailers into the area, following Wal-Mart's wake. They offer nothing concrete to suggest that such changes will likely occur or are planned for in this particular project area, but rely on broad statistical

---

[6] Namely, the future expansion of the Morial Convention Center, the expanded terminal activities at the Port of New Orleans, and the development of the Saulet Apartment complex.

data discussing general national trends. However, reasonable foreseeability under NEPA "does not include [such] 'highly speculative harms[.]'" <u>City of Shoreacres v. Waterworth</u>, 420 F.3d 440, 453 (citing <u>Methow Valley Citizens Council</u>, 490 U.S. at 356). As a result, plaintiffs' arguments fail.

Second, after studying the anticipated effects of increased traffic, HUD decided that the project would not cause traffic levels that would significantly affect human environment. In reaching its decision, HUD relied on two traffic studies performed by a contractor in December 2000 and September 2001. The latter was performed specifically to incorporate the effects of known plans for other development projects in the area. HUD relied on the traffic studies' projection of traffic conditions subsequent to completion of the St. Thomas revitalization project and the three other planned expansions. The studies indicated that traffic levels would remain well below capacity. HUD's reliance on those results was not arbitrary, capricious or unlawful, and

plaintiffs' argument to the contrary lacks merit.

In support of their position, plaintiffs cite to inconsistencies in background traffic measurements; noting that the September 2001 measurement for Jackson Avenue is lower by 3,600 cars than the December measurement, and arguing that the September 2001 measurement is purposely skewed in order to support the FONSI. First, plaintiffs provide nothing but conclusory allegations to support their claims of bad faith. Second, we note that HUD's findings relied on a separate set of measurements, different from the challenged background traffic measurements, that specifically reflect the potential road conditions after the completion of the St. Thomas project and the four other planned activities. Furthermore, we note that even if the higher, December 2001 measurement for Jackson Avenue is taken as correct, the street is still predicted to operate at some 30,000 cars below capacity. As a result, we cannot say, on this record, that plaintiffs have adequately supported their allegations of significant foreseeable cumulative effects

53

on human environment due to increased traffic caused by the project.

## 8. Mitigation

In reaching its FONSI, HUD relied in part on the mitigation requirements contained in the MOA developed as a part of required NHPA planning. On examination, we find that HUD did not rely on them arbitrarily or capriciously. The MOA's requirements were meant to alleviate adverse impacts on historic properties; many of its mitigation requirements focused on reducing the adverse effects on increased traffic on those properties. The measures are extensive, including "design review of new construction, rehabilitation of historic buildings, use of Belgian blocks to slow traffic at multiple intersections, and restriction of the entrance of truck traffic to Wal-Mart to Tchoupitoulas and Josephine Streets[.]" The MOA also requires the signatories to the MOA to ask the City to convene a traffic task force, seek funding for improvements to Jackson Avenue, and identify

grants for local retailers. Furthermore, the MOA binds the Housing Authority of New Orleans and HRI to its terms. Any attempt to change it requires consultation with and approval by all signatories, including federal and state agencies set up to protect historic areas. To reiterate, HUD is bound to adhere to the MOA's requirements, and may not relax or abandon them without the express authorization of all parties.

Plaintiffs argue that the above requirements will not provide the predicted mitigation, and that HUD's reliance on them is arbitrary and capricious. Plaintiffs characterize the mitigation as requiring merely letter-writing, mild research, and limited consultation. Furthermore, plaintiffs argue that the MOA has no teeth, as it can be changed at any time. Again, plaintiffs assume without demonstrating that such measures of mitigation are inherently unreliable and that an agency cannot reasonably base its decision to forgo an EIS, in part, upon them. The record before us, however, does not support their allegations. They have not, therefore,

shown that HUD relied on those mitigation requirements arbitrarily or capriciously.

9. Evaluation of Project Costs and Benefits

CEQ regulations state that "[a] significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial." 40 C.F.R. § 1508.7(b)(1). Plaintiffs argue that HUD is required to produce an EIS even though the project has no significant negative environmental effects, so long as it has significant positive environmental effects. This court has rhetorically considered the question, but has not arrived at an answer. Hiram Clarke Civic Club, Inc. v. Lynn, 476 F.2d 421, 426-7 (5th Cir. 1973) (disavowed on other grounds). We need not do so here, as HUD has not asserted nor have plaintiffs offered evidence of a significant positive environmental impact; HUD only indicates that when the overall benefits of the project are weighed against the temporary inconveniences of construction and any "partial long term market

disruption[,]" the St. Thomas project "provides a very positive net benefit to the community." Moreover, the other case in this circuit touching on the question can be distinguished on the grounds that it determines only whether an EIS need discuss positive benefits. Environmental Defense Fund v. Marsh, 651 F.2d 983, 993 (5th Cir. 1981). Without more, we may not find HUD arbitrary and capricious in this regard. Plaintiffs also urge that HUD improperly subtracted the project's positive environmental impacts from its negative environmental impacts, so that once significant negative effects became insignificant. The record before us is clear, however, that HUD has not engaged in any such weighing. Rather, it evaluated the potential negative effects and determined that they are not significant, either individually or cumulatively. Again, without further support, we may not say that HUD's assessment was arbitrary and capricious.

10. Consideration of Context and Intensity

Council on Environmental Quality regulations require an agency to consider both "context" and "intensity" when considering whether an effect is "significant". 40 C.F.R. § 1508.27 (defining "significantly" as used in NEPA's statutory language). In considering context, an agency must look at "the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a). When evaluating intensity, agencies should consider ten areas, listed in 40 C.F.R. § 1508(b). This court has held that "the factors listed in the regulation do not appear to be categorical rules that determine by themselves whether an impact is significant." Spiller, 352 F.3d at 243. Rather, the regulation provides a list of "relevant factors...[for] gauging whether an impact is 'intense'[.]" Id. An agency must only show that each factor was "in some way addressed and evaluated." Id.

First, with regard to intensity, our discussions in various sections above have repeatedly concluded that HUD

built in context consideration to its examination of a wide range of impacts, particularly with regard to environmental justice, zoning, businesses occupying historic properties, and traffic. In addition, those same discussions touch on HUD's consideration eight of the ten factors that Council on Environmental Quality regulations require agencies to consider regarding the intensity of a project.[7] Plaintiffs allege that their mere presence is

---

[7]Namely, the following sections of 40 C.F.R. § 1508.27(b):

(1) Impacts that may be both beneficial and adverse....
(2) The degree to which the proposed action affects public health or safety.
(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.
(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.
(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.
(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration
(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts.

reason enough to require an environmental impact statement. As support, plaintiffs offer arguments that reiterate those discussed in the sections above. As noted, the listed factors do not constitute categorical rules such that their presence or absence means an impact is per se significant. See Spiller, 352 F.3d at 243 (5th Cir. 2003). HUD must therefore show only that it addressed and evaluated these factors, even if it did not do so in a "factor-by-factor fashion" Id. We have concluded, in the preceding subsections, that HUD has not acted arbitrarily and capriciously in its evaluation of the project's context nor in its assessment of various individual intensity factors. Similarly, we now conclude that its overall evaluation of the project's context and intensity as a whole neither arbitrary or capricious.

Plaintiffs arguments on these points largely rehash

_____

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

the arguments they raised individually above, and we will not repeat our analysis of them here. Their only new arguments relate to traffic and to potential adverse effects on historic resources. They first argue is that the impacts of traffic were sufficiently controversial and uncertain that HUD was required to prepare an EIS. See 40 C.F.R. § 1508.27(b)(4). They adduce no evidence on this point, however, beyond their own opposition to the project and the same assertions we disposed on in our analysis supra, in discussing traffic impacts and cumulative impacts. As they have not met their burden of proof as to the broader controversy of traffic impacts, and since we above held that HUD's consideration of traffic issues was neither arbitrary nor capricious, we now do not find HUD's behavior arbitrary and capricious in this regard.

Second, plaintiffs argue that HUD did not properly consider the project's potential adverse effects on historic properties, as required by 40 C.F.R. § 1508.27(b). These arguments are similar to those they

raise challenging HUD's findings under the NHPA review process, discussed _infra_, and we reject them for the same reasons: HUD has prepared a valid Memorandum of Agreement that the consulting parties have agreed adequately resolves the project's potential adverse effects on historic properties, and was not arbitrary and capricious in determining that no National Historic Landmarks were adversely affected. <u>See</u> 16 U.S.C. § 470h-2(i) (stating that the NHPA shall not "be construed to require the preparation of an environmental impact statement where such a statement would not otherwise be required" under NEPA.").

## 11. Conclusion

Plaintiffs have raised numerous objections to HUD's EA and FONSI, but plaintiffs have failed to demonstrate in any instance that HUD acted arbitrarily, capriciously, or contrary to the law in deciding that the project did not cause significant effects to human environment.

III.

Four National Historic Landmarks are located in the St. Thomas project's Area of Potential Effects: the Garden District, the Vieux Carre, St. Alphonsus Church, and St. Mary's Assumption Church. Other historic properties are also located near and in the project site. Under NHPA § 106, HUD is required to consider the effects of its actions on these historic properties by the National Historic Preservation Act. As under NEPA, an agency's actions under the NHPA are procedural, and our review of its decisions is conducted under the Administrative Procedure Act's "arbitrary and capricious" standard. Vieux Carre Property Owners, Residents, & Assocs. v. Brown, 875 F.2d 453, 456 (5th Cir. 1989).[8]

A federal agency, the Advisory Council of Historic

_____

[8] These challenges arise out of the same cross-motions for summary judgment as the NEPA claims discussed supra. Plaintiffs contend that the district court erred in ruling that HUD arbitrarily and capriciously concluded that the project would result in no adverse effects to historic properties. Again, we review the district court de novo on this point. See Terrebonne Parish Sch. Bd. v. Mobil Oil Corp., 310 F.3d 870, 877 (5th Cir. 2002) (citing Auguster v. Vermilion Parish Sch. Bd., 249 F.3d 400, 401 (5th Cir. 2001)).

Preservation ("ACHP") has promulgated regulations that require federal agencies to examine whether a proposed project "has the potential to cause effects on historic properties." 36 C.F.R. § 800.3(a). Where an agency proposes a finding of no adverse effect, it indicates that the project has no effect on any historic property that "diminish[es] the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." 36 C.F.R. § 800.5(b) (read in conjunction with (a)(1)). Such a finding triggers a "consulting party review", described in 36 C.F.R. § 800.5(c).

If the agency finds that historic properties will suffer adverse effects, the agency must consult with the ACHP and the State Historic Preservation Officer ("SHPO") and other parties "to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize or mitigate adverse effects on historic properties." See 36 C.F.R. § 800.5(a) (requiring agencies to assess adverse effects); 36 C.F.R. § 800.6(a)

(requiring consultation). If adverse effects are found, and the agency, the SHPO, and the ACHP (plus any other required parties) may agree on a method of resolving those effects, to be recorded in a Memorandum of Agreement that specifies the manner of resolution. 36 C.F.R. § 800.6(b)(1)(4).

As in respect to environmental effects under NEPA, however, an agency has no duty to abandon or modify a project if the project is found to have an adverse effect that is not avoided or mitigated, but only to follow the mandated NHPA procedures.[9] 36 C.F.R. § 800.6. There is an exception to that rule applicable to National Historic Landmarks, as specially designated historic properties. They are subject to more stringent requirements. When an agency action will cause a direct adverse effect to a National Historic Landmark, the agency has an affirmative duty under NHPA § 110f to minimize the harm done. See also 36 C.F.R. § 800.10(a)

---

[9]Note that in many cases, as here, NHPA review is often built into the NEPA review process. See 36 C.F.R. § 800.8(c) (permitting such combination).

Plaintiffs raise two challenges to HUD's compliance with the NHPA: 1) that HUD's compliance with the NHPA § 106 process was defective and 2) that HUD had, and neglected to fulfill, a duty to minimize direct harm to National Historic Landmarks under NHPA § 110f. We deal with each in turn.

A.

Based on its finding that the St. Thomas project would result in some adverse effects, HUD went through the required consulting process with the SCHP, ACHP, and other required parties. HUD originally produced an MOA for the project in September 2000; no one challenges the fact that HUD was not a signatory to that document, and that as a result it may not have met the NHPA's requirements. See 36 C.F.R. § 800.6(c)(1)(I). In September 2002, however, HUD reopened its NHPA review, which resulted in a second, final MOA. The second MOA covers more of the project than the first MOA, which covered the residential portions of the project and

rehabilitation of the five remaining St. Thomas buildings. The second document covers all of the above, plus the Wal-Mart site and a nearby historic property, the Amelia Cotton Press. The document is signed by all necessary parties and contains various provisions meant to mitigate the project's effects on historic properties.

Plaintiffs argue that HUD's failure to sign the first MOA taints the validity of the second MOA. They assert that the second document can only be taken to cover the Wal-Mart and the Amelia Cotton Press and that, as a result, HUD has not adequately considered adverse effects on historical properties arising from the residential and rehabilitation portions of the project. We are not persuaded.

Plaintiffs offer no legal authority to suggest that the second MOA may not incorporate and bind the parties to, among other things, the same terms that had been included in the first, incomplete or deficient document. Second, a plain reading of the final MOA shows that it covers the effects of and mitigation for the entire

project. Plaintiffs offer no evidence that the document is meant to be interpreted in the limited fashion they urge. Accordingly, we adhere to the general rule that, absent other evidence, "[a] memorandum of agreement executed and implemented pursuant to this section evidences the agency official's compliance with section 106." 36 C.F.R. § 800.6(c). Plaintiffs cannot, therefore, show that HUD was arbitrary or capricious in relying on the second, final MOA as proof of its compliance with the requirements of NHPA § 106.

Plaintiffs' second argument asserts that HUD was required to undertake the "consulting party review" process laid out in 36 C.F.R. § 800.5(c). This assertion, however, misreads the governing regulations. 36 C.F.R. § 800.5(c) only requires consulting party review where HUD proposes a finding of no adverse effect on any historic property within the project's area of potential effects. Here, HUD made no such proposal; in fact, the agency found that there were adverse effects on certain historic properties such that it needed to consult with the ACHP

and SHPO to produce an MOA. The situation simply did not meet the requirements triggering 36 C.F.R. § 800.5(c). Plaintiffs's assert that a finding under NHPA § 110f of no adverse effects on National Historic Landmarks also triggers § 800.5(c)'s provisions, but offer no legal support for that reading, which conflicts with the plain language of the regulation. As a result, we conclude that HUD was not in violation of the NHPA's procedural requirements in not conducting consulting party review under § 800.5(c).

## B.

As noted above, NHPA § 110f imposes an affirmative duty on federal agencies to minimize harm to National Historic Landmarks where it finds that a project will adversely affect such landmarks. In conducting its assessment of whether the St. Thomas project would cause such adverse effects, HUD relies on the opinion letter it received from the National Park Service. That opinion letter was drafted by Cecil McKithan, a Park Service

employee, after he visited the project site for that express purpose. In it, Mr. McKithan stated that the St. Thomas project would not adversely affect the National Historic Landmarks. HUD relied on that letter in reaching its determination that the project would have no adverse effect on National Historic Landmarks in the area.

By October 2002, the State Historical Preservation Officer, the Advisory Council on Historic Preservation, and other consulting parties had expressed their objection to that determination. At that point, National Park Service contacted HUD at that point to let the agency know that it was reexamining its conclusion in response to those concerns. Mr.McKithan had by then retired, and the Park Service was reviewing his findings out of concern that it lacked sufficient information to support his determination. On December 16, 2002, however, the National Park Service withdrew its request for more time to assess the project's impact, on the grounds that it had reexamined the materials before it. In doing so, the National Park Service stated that "HUD, in accordance

with 36 C.F.R. § 800.10(c), appropriately sought National Park Service's comments and relied on those comments in good faith[.]" It did not withdraw its statement that the project would have no adverse effect. By February 2003, both the SHPO and the ACHP, the very parties who had initially questioned HUD's determination of no adverse effect with regard to NHLs, had again signed onto the MOA, indicating their agreement with that determination. See 36 C.F.R. §§ 110f(a) (noting that the results of the § 110f review process are to be incorporated into the NHPA § 106 process), 800.6(c) (a signed MOA evidences the agency's official compliance with NHPA § 106).

Plaintiffs challenge HUD's conclusion that the project will have no significant impact on National Historic Landmarks, arguing that HUD was arbitrary and capricious in relying on the NPS's recommendation since it knew that the Park Service's recommendation was unsupported and incorrect. Essentially, they argue that the National Park Service's request for additional time to reconsider its determination renders HUD arbitrary and

capricious for relying on the National Park Service's finding of no adverse impact. HUD may rely on the reasonable opinions of its own experts, however, and despite the reexamination, the National Park Service did not, as plaintiffs allege, withdraw its determination of no adverse effects. See Marsh, 490 U.S. at 378 (1989). Indeed, despite the significant consideration given to outside concerns, the National Park Service refused to rescind its decision. Without some further evidence pointing to flaws in the National Park Service's decision-making process and conclusion, HUD was not arbitrary and capricious in relying on the National Park Service's determination as support for its conclusion that the project would have no significant impact in this regard.

IV.

In addition to contesting HUD's decisions based on it EA/FONSI and MOA, plaintiffs also challenge the district court's disposition of various motions. They first appeal

from the district court's findings of ripeness and mootness with regard their challenges of the earlier versions of the environmental assessment/FONSI and MOA.

## A.

Plaintiffs filed suit in July 2002, seeking declaratory judgment that HUD and The Housing Authority of New Orleans failed to comply with NHPA and NEPA and an injunction forcing HUD to withhold grant funds until The Housing Authority of New Orleans became compliant. In October 2002, plaintiffs filed a motion for partial summary judgment and permanent injunction. On February 21, 2003, the district court granted HUD's motion for summary judgment, concluding in part that plaintiff's claims were not yet ripe for review because the court was "under the impression that the NEPA review was still pending." HUD had, in fact, closed the re-opened review on February 20, 2003, having again undertaken an environmental assessment and reached a FONSI; HUD, The Housing Authority of New Orleans, the SHPO, and ACHP

73

entered an amended MOA on February 1, 2003.

Plaintiffs challenge the district court's disposition on summary judgment of their challenges to the first environmental assessment/FONSI and MOA completed for the St. Thomas redevelopment project, before those processes were reopened by HUD. A grant of summary judgment is reviewed <u>de</u> <u>novo</u>, "applying the same standard on appeal that is applied by the district court." <u>Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.</u>, 310 F.3d 870, 877 (5th Cir.2002) (citing <u>Auguster v. Vermilion Parish School Board</u>, 249 F.3d 400, 401 (5th Cir.2001).

In deciding whether a matter is ripe for review, the court must consider "both the fitness of the issue for the judicial determination and the hardship to the parties of withholding consideration." <u>Abbott Laboratories v. Gardner</u>, 387 U.S. 136, 148 (1967). In making its determination, the court should evaluate three factors: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further

administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 733 (1998).

The district court here determined that while the complaint clearly met the case or controversy requirement of Article III, "judicial review at [that] time [was] inappropriate in light of the reopened reviews[,]" particularly since "[t]he ordinary remedy for unsustainable agency findings under NEPA is to remand the matter to the agency 'for further consideration.'" Accordingly, it held that at that time the claim would have inappropriately interfered with agency action, viz., the reopened NEPA and NHPA review processes. In considering the other two Ohio Forestry factors, it found that plaintiffs had "failed to demonstrate any hardship" would be suffered as a result of withholding review. Plaintiffs' motion to the district court alleged that "infrastructure work is being [per]formed, which is eliminating the possibility of real consideration of

alternatives to the present project," and that "[d]elay of review will harm plaintiffs['] ability to receive a true review of the Project's impact on the human environment and historic properties." A review of the record, however, indicates that the district court was given no further explanation or support for the statements beyond the allegations. Finally, the district court rightly noted that review at that time would entail judicial review of "an admittedly incomplete administrative record," as the processes in question had been reopened.

Given all of the above, the district court did not err in determining that the issue was not yet ripe for review: plaintiffs clearly had not made the showing necessary under the Ohio Forestry test, and their arguments fail before our court now for the same reasons.

B.

On March 31, 2003, plaintiffs amended their complaint to include the original environmental assessment/FONSI

76

and MOA as well as the environmental assessment/FONSI and the MOA resulting from the reopened process. Plaintiffs then filed a second motion for summary judgment and for a permanent injunction on April 4, 2003, again alleging noncompliance with NEPA and the NHPA, and seeking to stop all work on the project until an environmental impact statement and Section 106 review had been properly completed. That same day, HUD, The Housing Authority of New Orleans, and HRI all filed motions for summary judgment on the grounds that the reopened review complied with NEPA and NHPA. On April 11, 2003, the court entered an order in the case denying the plaintiffs' motion and granting HUD's motion in part. In that order, the court dismissed all of plaintiffs' claims arising under the NHPA. The court left open issues related to the first environmental assessment and FONSI insofar as they were necessary to determine awards of attorneys' fees, but stated that "the relief for remedying a deficiency in the original environmental assessment/FONSI deficient [sic] is now moot."

In March 2004, the court dismissed all of plaintiffs' remaining claims. In doing so, it held that the claims against the original MOA were moot, as they had been previously dismissed and were subject to the "law of the case" doctrine. In addition, the court held that challenges to the original environmental assessment/FONSI were moot and did not fall within the "capable of repetition, yet evading review" exception.

Plaintiffs first argue that the claims against the original MOA are not made moot by the law of the case doctrine because the later MOA does not encompass the entire project. The law of the case doctrine "expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power." Messinger v. Anderson, 225 U.S. 436, 443 (1912). The doctrine applies not only to issues decided explicitly, but also to everything decided "by necessary implication." Browning v. Navarro, 887 F.2d 553, 556 (5th Cir. 1989). We reject this argument for the reasons discussed supra; the second, final MOA is a comprehensive document and

supercedes the original.

Corrective action by an agency can moot an issue. See, e.g., Commissioner v. Shapiro, 424 U.S. 614, 622-23 n.7 (1976) (holding that proper service of new notice of deficiency and new notices of levy moots question as to whether prior actions were procedurally defective). Other circuits have found that subsequent agency action under NEPA moots a challenge to original compliance where there is no relief that would "undo" the harm. See Aluminum Co. of Am. v. Adm'r, Township of Huron, 175 F.3d 1156, 1163 (9th Cir. 1999) ("The... complaints are stale because a final environmental impact statement was prepared and we can grant no relief that would "undo" the operation of the [noncompliant agency action] during the period between issuance of the 1995 ROD and the final environmental impact statement."); see also WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, § 3533.7 ("At any rate, self-correction again provides a secure foundation for mootness so long as it seems genuine.); id. § 3533.2 ("Action by the defendant that simply accords all the

relief demanded by the plaintiff may have the same effect as settlement. So long as nothing further would be ordered by the court, there is no point in proceeding to decide the merits.... [M]ootness arises from the fact that in one way or another, the parties have acted voluntarily to dispose of the plaintiff's original claim for relief.")

In reopening the NHPA process, HUD took the voluntary action required to address plaintiffs' original claims. At the closure of that process, a second, final MOA was produced. As the St. Thomas project is no longer proceeding under the original version of the MOA, any remaining challenges to its validity have been mooted. The district court rightly disposed of claims against the final MOA in its April 13, 2003 ruling and, in its March 2004 ruling, explicitly recognizes the implicit results of that decision.

Plaintiffs next argue that the district court erred in refusing to apply the "capable of repetition, yet evading review" exception to their challenges against the

original environmental assessment/FONSI. This exception to the mootness doctrine applies where (1) the challenged action is too short to be fully litigated before it ceases and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again. Benavides, 238 F.3d at 671 (quoting Spencer v. Kenna, 523 U.S. 1, 17 (1998)). Plaintiffs do not argue the second requirement at all. As to the first, they argue that HUD is likely to avoid review on other proposals, plans, or actions by using the tactic of reopening NEPA or NHPA review. It is not, however, inappropriate to permit agency reconsideration to moot an initially unripe claim where the behavior involved no longer plays a causal role in the harm alleged. See Ohio Forestry Ass'n, Inc., 523 U.S. at 734. Here, HUD took corrective action when it reopened its NEPA review processes, which, despite its reconsideration, still yielded a FONSI; plaintiffs have not demonstrated that the original FONSI still plays a causal role in the various harms they assert under NEPA. Accordingly, the

later challenges to the original environmental assessment/FONSI and MOA were correctly denied as moot.

## V.

Plaintiffs next challenge the district court's April 11, 2003 rulings on their Rule 59 motion regarding (1) the completeness of the administrative record, (2) the prejudicial effect of the expedited briefing schedule, and (3) the application of an incorrect standard of review.

Rulings on Rule 59(e) motions are reviewed for abuse of discretion. Simon v. United States, 891 F.2d 1154, 1159 (5th Cir. 1990). Unless the district court clearly abused its discretion in determining that plaintiffs' motion neither established a manifest error of law or fact nor presented newly discovered evidence, the district court's ruling should not be disturbed. Id.

## A.

Plaintiffs attempt to introduce several pieces of

extra-record evidence in arguing that HUD was arbitrary and capricious in issuing a FONSI. In their Rule 59(e) motion, they argued that the administrative record was created impermissibly in response to litigation and does not contain certain documents that should be part of the record. Among these documents are Mr. Bagert's highly critical study of the HOPE IV program and the St. Thomas project in particular, a lead contamination study referred to by Dr. Mielke in his comments to the environmental assessment regarding lead contamination, and a Citywide Testing noise survey from April 20, 2000, which found high levels of noise.

The district court refused to grant reconsideration on the issue on the grounds that plaintiffs had failed to show that any of the documents in the record were created post hoc or not relied on by HUD in its decision-making. It further noted that plaintiffs' argument regarding the completeness of the record was "essentially a new vehicle for asserting the same arguments they made in opposition to summary judgment - i.e., that HUD failed to adequately

consider certain potential environmental impacts and ignored contrary information regarding these impacts."

Extra-record evidence may be admitted if necessary to determine whether an agency has adequately considered adverse environmental impacts. <u>Sierra Club v. Peterson</u>, 185 F.3d 349, 369-70 (5th Cir.1999); <u>Sabine River</u>, 951 F.2d at 678. A district court's decision regarding the admissibility of extra-record evidence is reviewed for abuse of discretion. <u>Davis Mountains Trans-Pecos Heritage Ass'n. v. Federal Aviation Admin.</u>, 116 Fed. Appx. 3, 16 (5th Cir. 2004) (citing <u>Northcoast Envtl. Ctr. v. Glickman</u>, 136 F.3d 660, 665 (9th Cir. 1998) and referencing <u>Davidson Country Oil Supply Co. Inc. v. Klockner, Inc.</u>, 908 F.2d 1238, 1245 (5th Cir. 1990) ("stating that '[t]he trial court's discretion to admit or exclude evidence is generally broad'").

As our analysis <u>supra</u> records, HUD fulfilled its duty under NEPA: it identified the issue, assessed it, and reached a supported conclusion, and we find no error in the district court's grant of the motion for summary

judgment. While plaintiffs may disagree with the outcome, HUD's environmental assessment did consider the issues raised, and included at least some of the information evidence plaintiffs urge was completely ignored, as has been discussed supra. We agree with the district court's assessment that the administrative record adequately supported HUD's FONSI, and similarly hold that the district court did not abuse its discretion in denying plaintiffs' Rule 59 motion in this respect. See Camp v. Pitts, 411 U.S. 138, 142-43, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

B.

Plaintiffs second challenge to the district court's denial of their Rule 59(e) motion alleges that they were prejudiced by the expedited briefing schedule, which was created as a result of HUD's misstatements regarding important deadlines.

On March 20, 2003, the district judge held a status conference, at which it set an expedited schedule for

reviewing the newly issued environmental assessment/FONSI and MOA based on the fact that the closing on the Wal-Mart site was scheduled for April 15. The district judge notes that plaintiffs "consented to an expedited schedule and even took part in negotiating the details of that schedule." HUD filed the Administrative Record on March 27, 2003; cross motions for summary judgment were filed April 4, 2003. Oppositions were filed on April 8, and oral argument held on April 10.

In an April 3 phone conference, plaintiffs requested an additional court day (from Friday to Monday) in which to review the record; the district court denied the request. The scheduled closing was delayed, finally occurring in October 2003, due to the pendency of a state-court bond validation lawsuit in which plaintiffs were also participants.

The district court did not abuse its discretion in denying the motion on this ground: all parties were subject to the same time constraints, plaintiffs helped develop and agreed to the expedited schedule, and

86

further, the closing was delayed due to a lawsuit in which plaintiffs were also participating.

## C.

Plaintiffs urge that the district court should have applied a more stringent standard of review to the NEPA process based on the fact that HUD's administrative record amounts to *post hoc* rationalization of its decision to issue a FONSI. As a basis, plaintiffs cite to the fact that certain studies were completed after the environmental assessment process was reopened. Nothing in the record, however, suggests that the information HUD provided was completed to provide *post hoc* justification for the agency's final environmental assessment/FONSI. Rather, the documents appear to be those relied on by HUD in reaching its determination after reopening the process. Furthermore, the reopened process led to changes in the project - notably, the imposition of additional traffic control measures. Since plaintiffs have not sufficiently demonstrated *post hoc* rationalization or

prejudgment, the district court applied the proper standard of review; <u>viz.</u>, "arbitrary and capricious."

## VI.

On December 18, 2002, the district court granted plaintiffs' Rule 41(a)(2) motion to dismiss The Housing Authority of New Orleans from the case, conditioned on payment of The Housing Authority of New Orleans's attorneys' fees and costs. In early January 2003, The Housing Authority of New Orleans re-entered the case as an intervenor, to protect interests threatened by plaintiffs' request for an injunction. In March 2003, the district court awarded The Housing Authority of New Orleans $1,800.50 in attorneys' fees, covering those tasks related to the original suit and not useful to The Housing Authority of New Orleans in its role as intervenor. Plaintiffs' final issue on appeal challenges that award.

Rule 41(a)(2) motions for voluntary dismissal are not usually appealable, since it is presumed that plaintiffs

obtained that which they sought.[10] <u>Yoffe v. Keller Indus.,</u> <u>Inc.</u>, 580 F.2d 126, 129 (5th Cir. 1978); <u>see</u> <u>also</u>, <u>Briseno v. Ashcroft</u>, 291 F.3d 377, 379 (5th Cir. 2002); <u>Mortgage Guar. Ins. Corp. v. Richard Carlyon Co.</u>, 904 F.2d 298, 300 (5th Cir. 1990). Under that rule, district courts have authority to attach conditions to such a dismissal in order to alleviate prejudice to the defendants, but such conditions should be tailored so that they only "alleviate the harm caused to the defendant." <u>LeCompte v. Mr. Chip, Inc.</u>, 528 F.2d 601, 604-5 (5th Cir. 1976). "[The Fifth Circuit has] left open the possibility that a rule 41(a)(2) dismissal with conditions imposed by the district court may constitute legal prejudice and thus render the dismissal appealable." <u>Briseno</u>, 291 F.3d at 379 (citing <u>Yoffe</u>, 580 F.2d at 129-30). We review conditions placed on a Rule

---

[10] Defendants assert that plaintiffs may not appeal the question of attorneys' fees because they were not brought before this court with a timely notice of appeal. Because plaintiffs are not entitled to attorneys' fees even assuming, <u>arguendo</u>, that they have timely appealed the issue, we decline to decide the question here.

41(a)(2) motion for voluntary dismissal for abuse of discretion. LeCompte v. Mr. Chip, Inc., 528 F.2d 601, 604 (5th Cir. 1976).

Appeal may be granted where 1) plaintiff is "legally prejudiced" by the attendant conditions and 2) has not "agreed to or legally acquiesced in those conditions." Mortgage Guar., 904 F.2d at 300 (citing Yoffe, 580 F.2d at 130). Legal prejudice arises only where the district court's conditions are "'clearly unreasonable' or 'so outrageous as to demand a full appellate review.'" Yoffe, 580 F.2d at 131; see also, Mortgage Guar., 904 F.2d at 301. Awards of attorneys' fees do not generally reach that level. See, e.g., Yoffe, 580 F.2d at 130-1; Mortgage Guar., 904 F.2d at 300-1 (Yoffe precedent makes arguments that such awards cause legal prejudice "difficult to sustain").

Plaintiffs challenge the rationale given for the district court's conditions, arguing that they named The Housing Authority of New Orleans as a defendant because their arguments, in part, challenged an MOA to which the

federal defendant, HUD, was not a signatory. The district court, however, correctly noted that plaintiffs' counsel should have been familiar with the fact that the APA "does not provide private plaintiffs a route for reviewing the actions of nonfederal defendants such as [The Housing Authority of New Orleans]." The court notes that plantiffs' attorneys were also counsel in two other NEPA/NHPA suits where that principle was clearly stated: <u>Vieux Carre Property Owners, Residents & Assoc., Inc. v. Brown</u>, 875 F.2d 453, 458 (5th Cir. 1989) and <u>Hayne Blvd. Camps Preservation Ass'n, Inc. v. Julich</u>, 143 F. Supp. 628, 631-2 (E.D. La. 2001). Fees were awarded to The Housing Authority of New Orleans in the amount of $1,800.50, calculated to cover only those activities The Housing Authority of New Orleans undertook as a defendant, not those occurring after it became an intervenor.

On those facts, the district court's condition did not create legal prejudice for the plaintiffs: plaintiffs brought suit against both HUD and the Housing Authority

of New Orleans, the APA contains no provision that at any time would have given plaintiffs a private cause of action against the Housing Authority of New Orleans, and from past experience, plaintiffs' attorneys should have known that to be the case. Furthermore, the fees awarded were closely tied to the time and effort the Housing Authority of New Orleans had expended in defending itself against those claims. Accordingly, the District Court's award of attorney's fees is not an abuse of discretion.

## VII.

For these reasons, we conclude that HUD's decision that an EIS was not required was not arbitrary, capricious, or contrary to law; that no further action is required of the agency at this time under NEPA or the NHLA; and that the district court committed no reversible error in its decisions or its handling of the case. Accordingly, HUD's decision and the judgment of the district court are AFFIRMED.