# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 12, 2009

Charles R. Fulbruge III
Clerk

No. 08-10890

CITY OF DALLAS, TEXAS

Plaintiff-Appellant

v.

H. DALE HALL, ET AL.

Defendant-Appellee

and

TEXAS WATER DEVELOPMENT BOARD

Plaintiff-Appellant

v.

UNITED STATES DEPARTMENT OF THE INTERIOR, ET AL

Defendants-Appellees

Appeal from the United States United States District Court
for the Northern District of Texas

Before SMITH and SOUTHWICK, Circuit Judges, and ENGELHARDT, District
Judge.[*]

---

[*] District Judge of the Eastern District of Louisiana, sitting by designation.

KURT D. ENGELHARDT, District Judge:

After preparing an Environmental Assessment ("EA") of the proposed Neches Wildlife Refuge in East Texas, the U.S. Fish & Wildlife Service ("FWS") announced its Finding of No Significant Impact ("FONSI"), obviating the need to prepare an Environmental Impact Statement ("EIS"). FWS then set an acquisition boundary for the refuge and accepted a conservation easement within that boundary. These actions precluded a reservoir the City of Dallas ("City") and the Texas Water Development Board ("TWDB") had proposed for the same site. The City and TWDB sued in federal district court claiming that the EA that FWS prepared was flawed, that under the National Environmental Policy Act ("NEPA") the agency was required to prepare an EIS, and that the establishment of the refuge violated the Tenth Amendment. The district court dismissed several of the Appellants' claims and granted FWS' motion for summary judgment on others. We AFFIRM.

## I.    BACKGROUND

In 1961, the State of Texas first identified a site along the Upper Neches River in Anderson and Cherokee Counties as a potential reservoir to serve the growing Dallas/Ft. Worth Metroplex. Dubbed the Fastrill Reservoir, the site was again included in a state water agency resources plan in 1984, and in the 1997 and 2001 regional water plans issued by TWDB. The City and TWDB's plan envisioned constructing the reservoir in 2050 and tapping it in 2060. There is nothing in the record prior to 2005 that indicates that the City or TWDB took any steps to develop the site beyond including it–among other possible reservoir sites–in regularly updated planning documents.

In 1985, FWS identified the same site as a possible wildlife refuge, since its native bottomland hardwood forest and wetlands provide an important wintering habitat for migrating waterfowl. That year, FWS listed the site as high-priority for protection. FWS approved a preliminary refuge proposal in 1988

and prepared a draft EA, but put the project aside for lack of funding. The project was revived in 2003 and the agency initiated public comment in June 2004. Public workshops were held in July 2004 and FWS made a presentation to the regional water planning group in October of that year. Another EA was prepared, which listed three alternatives: no action, the recommended 25,281-acre configuration, and a narrower 15,294-acre configuration. The EA referenced the reservoir proposal and noted that both the larger and smaller refuge configurations would prevent the reservoir from being built. The EA was distributed to public officials and interested groups, open meetings were held in May 2005, and it was open for public review and comment for two weeks that same month. More than 1,600 comments were received, but the EA was not revised, and a "final" EA was not issued. On July 28, 2005, FWS concluded that an EIS was unnecessary and prepared a FONSI.

By early 2005, the City was aware that FWS had revived the refuge proposal. On March 9, 2005, the Dallas City Council passed a resolution expressing a desire to work with FWS on a plan that would allow the reservoir and the refuge to coexist and authorizing a feasibility study. On August 16th, the Texas legislature designated the Fastrill Reservoir as a "critical resource," and the January 2006 regional water plan recommended building the reservoir as part of its water management strategy. Meetings were also held between the director of FWS and City representatives to discuss alternative sites for the refuge, and state and FWS representatives continued to communicate through the first half of 2006 about alternative plans that would allow a refuge and a reservoir to coexist. The City and TWDB scheduled–though did not actually begin–a series of engineering and environmental studies. By June 11, 2006, the day FWS designated an "acquisition boundary" for the refuge encompassing the larger 25,281-acre site, the feasibility study was not completed nor had Appellants taken any concrete steps toward planning the reservoir, such as

applying for permits. Accompanying the designation was a Conceptual Management Plan outlining how land within the boundary would be acquired. The Neches Wildlife Refuge was set to come into existence when FWS, by purchase or donation, took title to or an interest in property within the acquisition boundary. On August 23, 2006, FWS accepted a one-acre conservation easement from a landowner within the acquisition boundary.

TWDB and the City filed the instant suits on January 10, 2007, arguing *inter alia* that the EA was flawed, that FWS should have prepared an EIS, and that the refuge violated the Tenth Amendment. On October 24, 2007, the district court dismissed five of the City's claims, including the constitutional claim, and two of TWDB's claims, under Rule 12(b)(6). The parties filed cross-motions for partial summary judgment on the NEPA claims, and on June 30, 2008, the district court denied the Appellants' motions and granted FWS's motion. Relying heavily on *Sabine River Auth. v. U.S. Dep't of the Interior*, 951 F.2d 669 (5th Cir. 1992), the district court held that an EIS was not required because the establishment of the acquisition boundary did not cause any change in the physical environment. The court concluded that the refuge's effect on the City's water supply was speculative and not within the scope of NEPA. The court also found that the EA considered a reasonable range of alternatives and evaluated the necessary information. The City and TWDB moved for an injunction pending appeal and for entry of final judgment, which were granted on July 28, 2008. The parties subsequently filed a joint motion to amend the judgment, which was granted on September 4, 2008. Notice of appeal was filed on September 8, 2008, and the appeal was expedited on September 22, 2008.

## II.   DISCUSSION

## A.   Standard of Review

We review the district court's grant of summary judgment *de novo*. *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002).

The court may only set aside an agency's decision not to prepare an EIS where a plaintiff establishes that the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 375-76 (1989); *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976). Under this highly deferential standard of review, a reviewing court has the least latitude in finding grounds for reversal. *Sabine River*, 951 F.2d at 678. Courts may not use review of an agency's environmental analysis as a guise for second-guessing substantive decisions committed to the discretion of the agency. But "[i]n conducting our NEPA inquiry, we must 'make a searching and careful inquiry into the facts and review whether the decision . . . was based on consideration of the relevant factors and whether there has been a clear error of judgment.'" *Marsh*, 490 U.S. at 378 (citation omitted).

We review *de novo* a district court's dismissal pursuant to Rule 12(b)(6). *Ballard v. Wall*, 413 F.3d 510, 514 (5th Cir. 2005). "All of the plaintiff's allegations must be accepted as true, and the dismissal will be affirmed only if it appears that no relief could be granted under any set of facts that could be proven consistent with the allegations." *Id*. at 514-15 (internal quotation omitted). However, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002) (quotation omitted).

## B.    Sufficiency of the Environmental Assessment

NEPA does not require federal agencies to favor an environmentally preferable course of action, but rather requires that they take a "hard look at environmental consequences." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (quoting *Kleppe*, 427 U.S. at 410 n.21). The statute requires "all agencies of the Federal Government . . . [to] include [an EIS] in every recommendation or report on proposals for . . . major Federal actions

significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2). An EIS is not necessary when the federal action is not major or does not have a "significant impact on the environment." *Sabine River*, 951 F.2d at 677. To determine whether an EIS is necessary, an agency will perform an EA. *Sierra Club v. Espy*, 38 F.3d 792, 802 (5th Cir. 1994); 40 C.F.R. § 1508.9(a)(1) (defining an EA as a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact"). An EA is "a rough cut, low-budget environmental impact statement designed to show whether a full-fledged environmental impact statement–which is very costly and time-consuming to prepare and has been the kiss of death to many a federal project–is necessary." *Sabine River*, 951 F.2d at 677 (citing *Cronin v. U.S. Dep't. of Agriculture*, 919 F.2d 439, 443 (7th Cir. 1990)). An EA will result in a finding that an EIS is necessary or in a FONSI, indicating that no further study of environmental impacts is warranted. *La. Crawfish Producers Ass'n-West v. Rowan*, 463 F.3d 352, 356 (5th Cir. 2006).

1.    **Failure to Consider Alternatives**

An EA must discuss alternatives to the planned action, but need not discuss all proposed alternatives. *See* 40 C.F.R. § 1508.9(b) (assessment "[s]hall include brief discussions of the need for the proposal, of alternatives . . . of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted"); *see also La. Crawfish Ass'n*, 463 F.3d at 355 (NEPA "does not require that all proposed alternatives, no matter their merit, be discussed in the EA."). "[T]he range of alternatives that the [agency] must consider decreases as the environmental impact of the proposed action becomes less and less substantial." *Sierra Club*, 38 F.3d at 803; *see also Highway J Citizens Group v. Mineta*, 349 F.3d 938, 960 (7th Cir. 2003) ("When . . . an agency makes an informed decision that the environmental impact will be small

. . . a less extensive search [for alternatives] is required."). The rejection of even viable and reasonable alternatives, after an appropriate evaluation, is not arbitrary and capricious. *See Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 177 (5th Cir. 2000).

The EA in this case noted that "the area under consideration was identified in a preliminary study by the Texas Water Plan as an area with the potential for development as a reservoir . . . ." It also noted that the City was considering a feasibility study of the reservoir. It analyzed the effects of three different alternatives (no action, a larger refuge, and a smaller refuge) along multiple lines such as climate and air quality, water resources, vegetation, land use, and cultural resources. In each instance, the EA acknowledged and attempted to analyze the effect the alternative would have on the reservoir proposal. The EA also analyzed the cumulative impact of the refuge in conjunction with other "past, present, and reasonably foreseeable future actions," including the reservoir.

Appellants argue that FWS was required to consider an alternative that would allow the refuge and the reservoir to coexist. In the EA, however, FWS noted that it was unable to evaluate fully any such dual proposal, since plans for the reservoir were "speculative in the short-term, . . . not definitive in scope or purpose, and . . . far beyond the planning horizon for the refuge proposal (i.e., 20 years)." Additionally, after several weeks of consultation between staff at FWS, the City, and TWDB, a TWDB biologist admitted to the director of TWDB that "an alternative site that is equal to or bigger and/or better than the North Neches site has not yet been identified." The director echoed this assessment in a letter to FWS. Only after the closure of the public comment period and the drafting of the FONSI did FWS receive a proposal for alternative refuge sites. The alternatives included four other sites that Appellants claimed were of greater environmental value, since there was more bottomland hardwood extant

7

at these sites. Each of these alternatives, however, envisioned building the Fastrill Reservoir and the resulting inundation of the Upper Neches area, with destruction of vegetation in that region. The record reveals no alternative that allowed construction of the reservoir *and* served FWS' goal of preserving the bottomlands and wetlands of the Upper Neches. Under the circumstances, and especially given that FWS concluded that the project had no significant environmental impact, *see Sierra Club*, 38 F.3d at 803, this range of alternatives was reasonable.

## 2.  Failure to Consider Impacts

An EA must analyze both the direct and indirect effects of the proposed action that are "reasonably foreseeable," 42 U.S.C. § 4332(C)(ii); 40 C.F.R. §§ 1502.16(a) & (b); 40 C.F.R. § 1508.7, which we have defined as effects that are "sufficiently likely to occur that a person of ordinary prudence would take [them] into account in reaching a decision." *City of Shoreacres v. Waterworth*, 420 F.3d 440, 453 (5th Cir. 2005). "Reasonable foreseeability" does not include "highly speculative harms" that "distort[ ] the decisionmaking process" by emphasizing consequences beyond those of "greatest concern to the public and of greatest relevance to the agency's decision." *Robertson*, 490 U.S. at 355-56 (internal quotation marks and citations omitted). "[A] 'but for' causal relationship is insufficient to make an agency responsible for a particular effect under NEPA and the relevant regulations. Rather, a plaintiff mounting a NEPA challenge must establish that an alleged effect will ensue as a 'proximate cause,' in the sense meant by tort law, of the proposed agency action." *City of Shoreacres*, 420 F.3d at 452.

Appellants argue that FWS was required to analyze the effect of establishing the refuge on the City's water supply and urban planning process, given projected population growth. The cases cited by Appellants are inapposite, however, since they concern the effect of federal actions on *existing* water

8

sources, not proposed water sources. *See Sierra Club v. Marsh*, 769 F.2d 868 (1st Cir. 1985) (effect of port development runoff); *City of Davis v. Coleman*, 521 F.2d 661 (9th Cir. 1975) (effect of industrial development runoff); *California v. Dep't of Transp.*, 260 F. Supp. 2d 969 (N.D. Cal. 2003) (effect of airport construction); *Simmans v. Grant*, 370 F. Supp. 5 (S.D. Tex. 1974) (effect of eliminating water source). Plaintiffs do not cite to any authority for the proposition that an agency must account for the effects on a municipal water supply of precluding a proposed but as-yet-nonexistent water source.

Further, the effects of establishing the refuge, and thus precluding the reservoir, are highly speculative and cannot be shown to be the proximate cause of future water shortages in Dallas. The City and TWDB never committed to constructing the reservoir and may never have done so, or may have constructed a reservoir at another site. Besides including it in periodically updated planning documents, the City and TWDB have never taken any concrete steps toward constructing the reservoir, such as seeking permits, acquiring property, or commencing any of the hydrological, fiscal, or environmental studies necessary to a major public works project. In fact, the City and TWDB have never even settled upon the exact position of the dam or footprint of the reservoir. Thus, the City and TWDB have never identified the precise role the reservoir–even if constructed and tapped in 2060–will play in supplying the region's future water needs. Further, the City argues that water shortages in the region will begin as early as 2010, yet the reservoir would not be tapped earlier than 2060. Given the uncertainty over whether the reservoir will be constructed and its impact on water supplies, and the long time frame for the project, the effects of establishing the refuge on water supplies are not concrete enough, nor closely enough related to the federal action, to require that they be included in the EA.

3.   **Reliance on Old Data**

Appellants argue that FWS relied upon old data in its EA. Properly analyzing the risks of an action requires an agency to use updated information or data; reliance on out-of-date or incomplete information may render the analysis of effects speculative and uncertain, warranting the preparation of an EIS. *See Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Service*, 373 F. Supp. 2d 1069, 1081 (E.D. Cal. 2004). In this case much of the data in the EA was lifted from the earlier EA prepared in 1988. The City and TWDB note that there has been degradation of the site and that a significant portion of the Upper Neches bottomland hardwoods have been cleared. However, the City and TWDB have not shown that this information was so flawed that it precluded assessment of reasonably foreseeable impacts. Nor is it clear how, in this case, additional information as to environmental degradation of the Upper Neches would cause FWS to conclude it should leave the site unprotected. In this sense, the instant case differs from those cited by Appellants, where additional or updated information was needed before a reasoned decision could be made as to whether to intrude on a site. *See, e.g.*, *The Lands Council v. Powell*, 395 F.3d 1019, 1031 (9th Cir. 2005) (additional information on animal habitat needed before timber harvest could commence)[1]; *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1150 (9th Cir. 1998) (additional information on trout habitat needed before logging could commence), *overruled on different grounds*, *The Lands Council v. McNair*, 537 F.3d 981, 997 (9th Cir. 2008); *Klamath-Siskiyou Wildlands Ctr.*, 373 F. Supp. 2d at 1081 (additional information on owl population needed before logging could commence).

Undoubtedly, were a plaintiff to show that a site had become so degraded–for example, by substantial clearcutting of the bottomland hardwoods such that it would not support migrating waterfowl even if protected–such a

---

[1] *Lands Council* also differs from the instant case in that it involved an EIS, which is by design a more comprehensive document than an EA.

showing may well render the decision to rely on older data arbitrary within the meaning of NEPA. No such showing has been made in this instance. Here, the use of older data in an EA–by definition a "rough cut, low-budget" assessment of environmental impacts on the way to determining whether an EIS is necessary, *see Sabine River*, 951 F.2d at 677–cannot be said to be unreasonable. Nor does the use of this data in this instance support forcing the agency to engage in a process likely, because of its lengthy timeline, to permit further environmental degradation of the site before a decision is reached.

**4.     The FWS Decision Making Process**

Finally, the City and TWDB also argue that the decision making process FWS engaged in was a sham. Appellants point to several flaws: FWS's choice of a 20-year project horizon for analysis of impacts, its failure to coordinate with local and state planning agencies in violation of CEQ regulations, and its failure to publish a "final" EA. The record reveals that FWS engaged in an extensive process of public education and public comment and even worked with officials from the City and TWDB to identify an alternative site that would allow the refuge and the reservoir to coexist. Emails between various FWS officials reveal nothing more than an appropriate advocacy for a favored agency alternative. In arguing that FWS was required to publish a "final" EA, Appellants cite only to non-binding internal policy memos and not to any binding regulation or statute. Appellants' assertion that FWS abused its discretion by failing to "coordinate" with the local, regional, and state water planning process falls short, since neither NEPA nor any of the other statutes the City or TWDB cite require an agency to insinuate itself into state planning processes in the manner suggested. Finally, Appellants fail to show that FWS's 20-year planning horizon was arbitrary and capricious under the circumstances. As the district court noted, "FWS must set some kind of time frame for its evaluations; it cannot have an

interminable planning period." *City of Dallas, Tex. v. Hall*, 2008 WL 2622809, at *14 n.10 (N.D. Tex. June 30, 2008).

## B.     Requirement of an EIS

In arguing that an EIS was required, Appellants attempt to distinguish this case from *Sabine River*. In that case, strikingly similar to the present one, FWS set an acquisition boundary for a wildlife refuge on 3,800 acres in East Texas, and accepted a negative, no-development easement from a landowner inside the acquisition boundary. *See Sabine River*, 951 F.2d at 674-76. The designation precluded the construction of a proposed reservoir. *Id*. at 673. The reservoir was in the preliminary planning stage, and the state agency with jurisdiction over it had "obtained none of the necessary federal and state permits, had secured no funding, and had not yet entered into any firm contracts for the 300 thousand plus acre feet of water that the reservoir would generate each year." *Id*. We concluded that "the acquisition of a negative easement which by its terms prohibits any change in the *status quo* does not amount to 'major Federal action[ ] significantly affecting the quality of the human environment.' . . . The acquisition of a negative easement which prohibits development does not result in the requisite 'change' to the physical environment." *Id*. at 679-80 (citations omitted). The acceptance of such an easement is "tantamount to inaction," and thus the acceptance "did not effectuate any change to the environment which would otherwise trigger the need to prepare an EIS." *Id*. at 680. In the instant case, the district court properly set forth the factors to consider in applying *Sabine River*: whether the agency action (1) precludes any development of the land, (2) changes the character or function of the land, and (3) prohibits any change in the *status quo* of the land. *City of Dallas, Tex*., 2008 WL 2622809 at *5.

The City argues that three independent authorities dictate that an EIS was required in this instance: FWS's own NEPA guidelines, the NEPA

implementing regulations issued by the U.S. Department of the Interior ("DOI"), and the NEPA implementing regulations issued by the Council on Environmental Quality ("CEQ"). The FWS guidelines include a number of criteria to assist the agency in determining whether an EIS is needed. Among these are "increased safety or health hazards," 550 FW 3.3(B)(2)(e), and "[a]dverse effects on municipal, industrial, or agricultural water supply or quality . . . ," *id.* at 3.3(B)(2)(i). The City points to these guidelines and argues that an EIS is required to weigh adequately the health and water supply effects of not building the reservoir. But these guidelines have no binding force. *See Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 229 (5th Cir. 2005) ("Generally, to be legally binding on an agency, its own publications must have been 'promulgated pursuant to a specific statutory grant of authority and in conformance with the procedural requirements imposed by Congress.'") (citation omitted). When agency publications have not been promulgated pursuant to a specific grant of statutory authority, an agency's decision to analyze impacts by other methods is not automatically arbitrary and capricious. *Id.* at 230. These guidelines were not promulgated pursuant to law. Further, by their own terms, they are meant to *assist* in determining whether an EIS is necessary, not *dictate* when an EIS is necessary, and carefully note that whether any of the criteria triggers the need for an EIS depends in each instance on "the severity and duration of effects." FW550 3.3(B)(2).

The DOI regulations the City points to are binding on the agency, but they do not mandate the preparation of an EIS in this case. In the regulations, among the "Major Actions Normally Requiring an EIS" are "major new refuge system units . . . which involve substantive conflicts over existing State and local land use [or] significant controversy over the environmental effects of the proposal." 62 Fed. Reg. 2375, 2382. The City argues that the refuge meets both these criteria. But by their own terms, the regulations "normally" require preparation

of an EIS but do not dictate preparation in each case. Further, the regulations clearly envision that when, pursuant to an EA, the agency determines that an action will have no major environmental impacts, an EIS is not required even when the action otherwise meets the criteria. *Id*. In this case, after preparing an EA the agency made a reasoned decision that there were no significant environmental effects.

More importantly, by their own terms the regulations only envision preparation of an EIS when there is a conflict with "existing" State and local land use or where there is "significant" controversy over environmental effects. In this case, while a feasibility study has been completed, the City and TWDB have taken no concrete steps to develop the reservoir (such as applying for permits), much less put any land to use. The development of an acquisition boundary does not conflict with existing State and local use, but merely with a potential future use. Further, the City and TWDB have been unable to show with any specificity the effects of setting the acquisition boundary. A controversy such as this one–over the highly speculative, uncertain effects of not building a particular reservoir–cannot be "significant" within the meaning of both the regulations and NEPA.

Similarly, while the CEQ regulations that the City points to are binding on federal agencies, *see Fritiofson v. Alexander*, 772 F.2d 1225, 1236 (5th Cir. 1985), they do not mandate the preparation of an EIS in this case. The regulations merely require an agency to determine whether an action is one that normally requires an EIS. *See* 40 C.F.R. § 1501.4(a). If the agency determines that the action does not normally require an EIS, it then prepares an EA and makes a finding as to whether the proposed action has significant environmental impacts. *Id*. at 1501.4(b). In this case, as described above, FWS properly prepared an EA and made a FONSI, as envisioned by the CEQ regulations.

TWDB also argues that the instant case is distinguishable from *Sabine River* because the refuge designation in this case will cause changes in the physical environment. As noted in the EA, FWS envisions removing non-native tree species in the refuge and reintroducing native hardwood and evergreen species. TWDB argues that this distinguishes the case from *Sabine River*, where there was no evidence that the refuge site would be changed in any way by the acceptance of an easement. *See Sabine River Auth. v. U.S. Dep't of the Interior*, 745 F. Supp. 388, 394 (E.D. Tex. 1990). However, as the district court noted in its order denying Appellants' motion for partial summary judgment, the action at issue here is the establishment of an acquisition boundary for the refuge. The establishment of that boundary does not effect any change in the physical environment, but merely authorizes the purchase of property from willing buyers or the acceptance of conservation easements. Once sufficient land is acquired, FWS will be required to comply with NEPA in formulating a Comprehensive Conservation Plan to guide refuge forest management. If changes in the physical environment are proposed in that plan, an EIS may be required. But the present federal action will have no significant physical effects such that an EIS is required.

As in *Sabine River*, where the acceptance of a negative, non-development easement was "tantamount to inaction," *Sabine River*, 951 F.2d at 680, setting an acquisition boundary for the refuge does not effect a change in the use or character of land or in the physical environment. Thus, it is not a "major Federal action[] significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2), and no EIS is necessary under the requirements of NEPA.

## C.    Tenth Amendment Claims

Finally, Appellants argue that the establishment of the refuge is unconstitutional because it impermissibly intrudes on state sovereignty and

violates the Property[2] and Necessary and Proper Clauses.[3] Before ruling we must determine precisely what, if any, issues are properly before us. In its amended complaint, the City alleged that there was not a sufficient nexus between the agency's action and interstate commerce, and that FWS violated the City's Tenth Amendment right to secure sufficient water supplies for future residents. In its brief before the district court, however, the City conceded that it could not challenge the constitutionality of the statutes allowing for acquisition of property. The City's brief also did not argue a constitutional right to secure water supplies, which the district court nonetheless characterized as "a spurious argument without legal basis." *City of Dallas, Tex. v. Hall*, 2007 WL 3125311, at *11 (N.D. Tex. October 24, 2007). Rather, the City asserted that FWS exceeded its authority under the Tenth Amendment when it established the acquisition boundary and accepted the conservation easement, because it did so for the purpose of commandeering the state's water planning process and thwarting the reservoir. Because these were not the allegations pleaded in the amended complaint, the district court declined to consider them on the motion to dismiss for failure to state a claim. The allegations in the amended complaint, not having been appealed, are waived.

In its brief before this court, the City revises its constitutional argument. In this iteration, the City argues that FWS, by establishing the refuge, has unconstitutionally invaded a traditional area of state sovereignty–water and land use planning–without clear authorization from Congress. Additionally, it argues that establishing the refuge violates the Tenth Amendment by running afoul of the Property and Necessary and Proper Clauses. These arguments bear only a passing resemblance to the City's arguments on the motion to dismiss,

[2] U.S. CONST. art. 4, § 3, cl. 2.

[3] U.S. CONST. art. 1, § 8, cl. 18.

16

and none at all to its arguments in the amended complaint. Accordingly, these arguments are not properly presented and we decline to consider them. *See Singleton v. Wuff*, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."); *Fed. Deposit Ins. Corp. v. Mijalis*, 15 F.3d 1314, 1327 (5th Cir. 1994) ("[I]f a litigant desires to preserve an argument for appeal, the litigant must press and not merely intimate the argument during the proceedings before the district court. If an argument is not raised to such a degree that the district court has an opportunity to rule on it, we will not address it on appeal.").

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM the decisions of the district court.