# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 25, 2013

No. 12-40578
Summary Calendar

Lyle W. Cayce
Clerk

DONNA M. HENDERSON,

Plaintiff–Appellant

v.

CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL
SECURITY,

Defendant–Appellee

Appeal from the United States District Court
for the Eastern District of Texas
4:10-cv-222

Before SMITH, PRADO, and HIGGINSON, Circuit Judges.

PER CURIAM:[*]

Plaintiff–Appellant Donna Henderson ("Henderson") appeals the district court's affirmance of the Social Security Commissioner's decision denying Henderson social security benefits because she was not disabled as of the last day of her social security benefits coverage.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-40578

Henderson was born in 1949, making her 53 when she was last insured for benefits and 58 when the Administrative Law Judge ("ALJ") rendered his most recent decision in the case. She has a high school degree and last worked as a licensed practical nurse in 1997. She was insured for social security benefits through June 30, 2002.

The present claim is not Henderson's first. Henderson had previously filed a claim for benefits—alleging that she had been disabled since 1976—which the Social Security Administration denied in 1995. Later, Henderson reported having suffered a stroke, which necessitated a 1996 laser surgery to repair the affected area of her heart. In October 1997, while working as a licensed practical nurse, Henderson injured her back while steadying a patient who had started to fall.

Later physicians noted that she had a history of mitral valve prolapse. Neurosurgeon Marcos A. Ramos, M.D., stated Henderson previously exhibited cardiac symptoms, and that she had undergone a successful laser surgery. In December 1997, he noted that she was alert, oriented, talkative, and coherent. Thereafter, in 1998, Henderson filed an application alleging disability from the October 1997 back injury, which the Social Security Administration denied in 1999.

In July 1999, Neurologist Daniel J. Hopson, M.D., noted that Henderson had a history of mitral valve prolapse and cardiac arrhythmia and had possibly suffered a small stroke in 1995. He treated her for back and left leg pain. He noted that she denied any prior neurological symptoms, but that she was reporting some symptoms of depression and memory loss associated with her prior stroke. He stated she had 5/5 strength in her lower extremities. Her MRI and EMG were negative. Hopson saw Henderson twice more in 2000, at which point he ordered a lumbar spine MRI. The test result was normal, showing no evidence of disc herniation or stenosis. Hopson's records for Henderson's July

2

No. 12-40578

2000 visit noted normal gait, station, and balance, and a strength of 5/5 in the lower extremities. In January 2001, Hopson said she suffered back injury, and has resulting neuralgia pain, but given her negative test results he had no further treatment recommendations. In June 2001, he noted her lumbar pain, negative neurologic exam, and 5/5 strength assessment.

A February 2001 record from Steven L. Remer, M.D., noted that Henderson's past medical history included a history of mitral valve prolapse, and a history of cardiac arrhythmia with no recurrent problems. In July 2001, Henderson returned to Dr. Hopson. He ordered a lumbar CT, which revealed an annular tear, but no significant disc bulge at any level. Her strength continued to be 5/5. In July 2002, Hopson reported that Henderson had 5/5 motor strength, chronic lumbar pain with a recent flare-up, but no motor or sensory loss.

On July 22, 2002, Henderson applied again for Title II disability insurance benefits, alleging that she had been disabled since October 10, 1997, due to her back injury and memory problems. Her insured status ended on June 30, 2002.

On October 31, 2002, after Henderson had applied for benefits, Dr. Kabel completed a psychiatric evaluation of her. Henderson reported occasional depression. Dr. Kabel noted that Henderson had "some cognitive problems" but stated that a specialist should be consulted for more precise prognosis. He assessed her Global Assessment of Functioning ("GAF")—a scale used to rate the social, occupational, and physiological functioning of adults—score at 60, based on psychological factors alone. A score of 60 indicates "moderate symptoms," but is on the verge of "some mild symptoms." He noted that she told him she gets up every morning, has coffee, watches the news, bathes, dresses, cleans the house, makes the bed, and runs errands. She occasionally dates and has a friend with whom she goes out to eat or to the movies.

In December 2002, state medical consultant A. Boulos, M.D., stated that Henderson's depression was secondary to the stroke and determined that

3

Henderson did not have a severe mental impairment, but that what impairments she did have resulted in mild restriction of daily activities.

In January 2003, the lumbar spine MRI that Dr. Hopson ordered indicated a "mild diminution in disc signal intensity without diminution in disc height . . .[and] no focal disc protrusion or central spine stenosis or foraminal stenosis." His office notes from January 2003 indicate he had the impression she had a memory disorder, but his stated plan was to continue with current pain and depression medicines and follow up in three months. At the same visit he also noted that she had normal speech, comprehension, strength, coordination, gait, and balance. She also reported fatigue and decreased mood to Dr. Hopson. He filled out an Estimated Functional Capacity Form, noting that she could occasionally lift and carry up to ten pounds and sit four hours a day with rests, but could not perform other postural activities. In June 2003, Hopson noted that Henderson had sciatic nerve pain, and should stay off work. He noted that her pain was controlled with analgesics and prescriptions from his office.

In March 2004, Dr. Mount, a clinical psychologist, performed a psychological evaluation of Henderson. He noted that her affect and mood were depressed, she had some suicidal ideation, tearfulness, and anxiety. He diagnosed a mood disorder and a GAF of 45, indicating "serious symptoms."

Administrative hearings were held in 2004 and 2005. At the 2005 hearing, medical expert David Sowell, M.D., testified that Henderson's motor and sensory functions were generally intact, and that there was a general lack of findings that could confirm her reported pain. He said she had degenerative disc disease, but that there was no evidence of nerve root compression. Henderson testified that she had constant pain which required prescription pain relievers and ibuprofen. She testified that she had been depressed since 2002. She testified that she performs light housework, but had given up attending church. She said she speaks to friends on the phone, eats out, and goes to the movies, but only

finds relief through hot baths. She also testified that she traveled to Shreveport to visit her daughter every few months. When asked by the ALJ whether she sought counseling, she replied, "I don't want to spend my life in a psychiatrist's office, and so I don't go." After she told the ALJ that doing so would do no good, he ceased that line of questioning.

Ultimately, the ALJ denied Henderson's claim on June 9, 2005, finding that Henderson was not disabled as of June 30, 2002, the date that she was last insured. The 2005 decision indicated that degenerative disc disease was Henderson's only severe impairment, and that Henderson retained the ability to perform a significant range of light work. The Appeals Council vacated and remanded the ALJ's 2005 decision. The Appeals Council directed the ALJ on remand to give further consideration to the treating and examining source opinions, further evaluate Henderson's subjective complaints, give further consideration to Henderson's maximum functional capacity, and obtain supplemental evidence from a vocational expert.

Another administrative hearing was held on November 13, 2007. Henderson, her daughter, a medical expert, and a vocational expert testified. Neurologist Susan Blue, M.D., testified that Henderson did not meet the degree of limitations necessary to be deemed disabled. Instead, Henderson had symptoms consistent with a mild radiculopathy. Dr. Blue opined that, based on the findings in the record, Henderson could lift twenty pounds frequently, lift forty pounds occasionally, sit for two hours at a time up to six hours a day, and crawl and bend occasionally. Dr. Blue testified to having reviewed Dr. Hopson's records, but stated she did not see any physical justification for his opinion. Dr. Blue, acknowledging that Henderson experienced some pain, also stated she was giving Henderson the "benefit the doubt" because there was insufficient objective evidence to substantiate the limitations that Henderson claimed. Dr. Blue,

noting that Henderson had been prescribed numerous medications, opined that Henderson's motivation was a problem.

Vocational expert Tammie Donaldson, M.S., testified that Henderson's past work included light, unskilled work as a fundraiser, and light, skilled work as an office nurse. Donaldson testified that an individual with Henderson's specified exertional and nonexertional functional limitations could perform Henderson's past relevant fundraising work. Donaldson also identified other jobs that someone Henderson's age could perform, taking into account her education and specified limitations. Donaldson also testified as to how many thousands of each such possible job were in Texas.

The ALJ issued a second unfavorable decision on January 23, 2008, finding that Henderson was not disabled because she was capable of performing her past relevant work. Specifically, he determined that Henderson had severe physical and mental impairments, but did not have an impairment that met or equaled any listing through her date of insurance. The ALJ indicated that Henderson had mild restrictions in daily activities and moderate difficulties with concentration, persistence, or pace, but that she had no difficulties with social functioning and no episodes of decompensation. He found that her impairments resulted in limitations that restricted her to work that fell between light and medium. More specifically, the ALJ determined that Henderson retained the residual functional capacity to lift forty pounds occasionally and twenty pounds frequently, sit for six of eight hours, and stand/walk two of eight hours (thirty minutes at a time). She had the ability to understand, remember, and follow simple and detailed instructions and complete repetitive tasks. According to the vocational expert's testimony, Henderson retained the capacity to perform her light, unskilled past relevant work as a fundraiser. Thus, the ALJ denied her application.

No. 12-40578

The Appeals Council denied Henderson's request for review, making the ALJ's 2008 decision the Social Security Commissioner's final opinion. Henderson sought judicial review before the District Court for the Eastern District of Texas. United States Magistrate Judge Don D. Bush recommended that the District Court affirm the Commissioner's decision. United States District Court Judge Richard Schell adopted the Report and Recommendation of the Magistrate Judge and issued a Final Judgment affirming the Commissioner's decision. Henderson appealed.

## II. JURISDICTION

The District Court had jurisdiction pursuant to 42 U.S.C. § 405(g). Henderson timely filed a notice of appeal. This court has jurisdiction pursuant to 28 U.S.C. § 1291.

## III. DISCUSSION

### A. Standard of Review

The federal courts review the Social Security Commissioner's denial of social security benefits only to ascertain whether (1) the final decision is supported by substantial evidence, and (2) whether the Commissioner used the proper legal standards to evaluate the evidence. *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000). Substantial evidence is more than a scintilla, but less than a preponderance. *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994). The Court of Appeals does not re-weigh the decision, try the issues de novo, or substitute its judgment for that of the Commissioner. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1994). Therefore, a finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidence to support the decision. *See Johnson v. Bowen*, 864 F.2d 340, 343–44 (5th Cir. 1988).

In determining whether a claimant is disabled under Title II, a five-step "sequential evaluation" is used. First, a claimant engaged in substantial gainful

No. 12-40578

employment at the time of her claim is not disabled.  20 C.F.R. § 404.1520(b).
Second, the claimant is not disabled if her alleged impairment is not severe.
*Id.* § 404.1520(c).  Third, if the alleged impairment is severe, the claimant is
considered disabled if her impairment corresponds to an impairment described
in 20 C.F.R., Subpart P, Appendix 1.  *Id.* § 404.1520(d).  Fourth, a claimant with
a severe impairment that does not correspond to a listed impairment is not
considered to be disabled if she is capable of performing her past work.
*Id.* § 404.1520(e), (f).  The fifth step involves determining whether the claimant
could perform some work in the national economy.  *Id.* § 404.1520(g).  At this
stage, the burden shifts to the Commissioner to establish that there are jobs in
the national economy that the claimant can perform, consistent with her
medically determinable impairments, functional limitations, age, education, and
work experience.  *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

### B. Analysis

On appeal, Henderson raises two issues, the first of which has several
subpoints.  First, she argues that the ALJ failed to set forth a proper evaluation
of her mental impairments.  Second, she disputes the ALJ's determination that
Henderson's account of her limitations was not entirely credible.  Although she
raises specific issues, which we discuss below, ultimately, our review is limited
to whether the ALJ applied the correct legal standard and whether there is
substantial evidence supporting his decision. We affirm as to both.

### 1. *Whether the ALJ properly evaluated Henderson's mental impairments*

As to the issue of whether the ALJ properly evaluated Henderson's mental
impairments, she raises several subissues.  She alleges that the ALJ failed to
comply with the Appeals Council's remand order, that the ALJ did not adequately
analyze her mental impairments, and that the ALJ erred by not sufficiently
discussing his conclusions.  Finally, she alleges the ALJ erred in determining her
mental residual functional capacity.  We affirm the district court as to all four.

8

No. 12-40578

*a. Did the ALJ fail to comply with the remand order?*

Henderson first alleges that, on remand, the ALJ failed to comply with the Appeals Council's remand order. As discussed above, after the first series of hearings, the Appeals Council remanded the case to the ALJ with several instructions: (1) give further consideration to the opinions of those that treated and examined her as to her mental impairment; (2) evaluate her subjective complaints; (3) with regard to her residual functional capacity, provide rationale and references to support assessed limitations; (4) obtain evidence from a vocational expert concerning appropriate jobs Henderson could perform and their incidence in the national economy.

This contention is without merit because although Henderson cites some case law for the proposition that failure to comply with an Appeals Council order constitutes reversible error, none is mandatory authority. In fact, all three are district court opinions from outside the Fifth Circuit, and none is published. Instead, the clear rule is that remand is warranted only where the ALJ's decision fails to apply the proper legal standard or the decision is not supported by substantial evidence. In an abundance of thoroughness, we note however, that the ALJ addressed each category that he was directed to evaluate on remand.

First, the ALJ was directed to give further consideration to the treating and examining opinions regarding Henderson's mental impairment. As the magistrate judge's Report and Recommendation notes, the ALJ did not entirely reject Dr. Hopson and Dr. Mount's opinions, but instead afforded them little evidentiary weight. "Even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability . . . [t]he opinions may be assigned little or no weight when good cause is shown[,] . . . [like] where the treating physician's evidence is conclusory . . . or is otherwise unsupported by the evidence." *Newton v. Apfel*, 209 F.3d 448, 455–56 (5th Cir. 2000). In his 2008 decision, the ALJ explained that he gave little weight to

evidence from Drs. Hopson and Mount because their opinions were inconsistent with other evidence presented, such as Henderson's own testimony about her daily activities and the negative EMGs, MRIs, and normal assessment of her gait and reflexes during examinations. As required, the ALJ addressed the factors that must be considered before an ALJ can decline to give a treating physician's opinion controlling weight. *See Newton*, 209 F.3d at 456.

Second, the Appeals Council directed the ALJ to further evaluate Henderson's subjective complaints. He did so. His 2008 decision detailed his reasons for doubting the credibility of Henderson's account. He noted that, at the first hearing, Henderson testified to eating out several times a week, dating occasionally, cooking, attending movies and visiting her daughter in Shreveport. He held that while her impairments could have produced the alleged symptoms, "her statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible," presumably due to the personal activities she completes.

Third, on remand, the ALJ was to provide explanation and references to support any assessed limitations regarding her residual functional capacity. Before considering step four of the sequential evaluation process, the ALJ must first determine the claimant's residual functional capacity. 20 C.F.R. § 404.1520(e). An individual's residual functional capacity is her ability to do physical and mental work activities despite limitations from impairments. 20 C.F.R. §§ 404.1520(e), 404.1545. The ALJ spent approximately five pages detailing his findings about her residual functional capacity, relying in part on testimony of medical experts, including Dr. Hopson, Dr. Kaber, and at least six others. Medical expert Dr. Sowell testified that Henderson had a residual functional capacity for medium-level work.

Finally, the Appeals Council had directed the ALJ to obtain the testimony of a vocational expert on remand. Pursuant to this directive, at the hearing upon

which the ALJ's ultimate decision was based, vocational expert Tammie Donaldson offered detailed testimony about job availability for someone with Henderson's level of education and impairment.

Moreover, Henderson, in her request for review in front of the Appeals Council, argued that the ALJ had not followed the Appeals Council's remand instructions.  Had the Appeals Council thought that the ALJ had not complied with its remand order, the Appeals Council could have granted Henderson's request for review, which it denied.

*b. Did the ALJ adequately analyze Henderson's mental impairment?*

Henderson also contends on appeal that the ALJ failed to adequately analyze her mental impairments at step two of the sequential evaluation process, specifically in regard to her stroke.  The ALJ found that Henderson had two severe impairments: degenerative disc disease and depression.  Having found that Henderson suffered from severe impairments, the ALJ thus progressed to step three.  Henderson argues that it was error for the ALJ not to find her stroke to be a severe impairment.  The ALJ's step two determination states in part: "the claimant worked after her stroke and it did not constitute a severe impairment." Henderson argues this statement erroneously implies that because she worked after the stroke, it cannot have been severe.  The ALJ could appropriately use the fact that Henderson continued to perform skilled work as a practical nurse for more than two years after the alleged stroke to substantiate his conclusion that her stroke was not a severe impairment.  *See Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985) ("[A]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.") (alterations in original).

Moreover, Henderson bears the burden of establishing a severe impairment from the stroke.  *See Bowen v. Yuckert*, 482 U.S. at 146 n.5 (stating that plaintiff

bears the burden at step two of the sequential evaluation process).  The ALJ's decision cites and applies the correct standard from *Stone*, 752 F.2d at 1101.  The ALJ acknowledged that Henderson reported having had a stroke, although there is some inconsistency as to the year of the stroke.  He found that she had a normal brain MRI.  The ALJ noted that an examining neurosurgeon found her to be alert, oriented, and pleasant, with normal thought and speech.  He also noted that although Henderson self-reported memory loss due to a stroke, she also delivered to him an articulate four-page letter she had written containing a well-crafted and concise medical history.  The ALJ had before him the report of a treating physician, Dr. Remer, that noted a "history of mild stroke secondary to arrhythmia with full recovery."  Our review on this point is limited to determining whether the ALJ applied the correct legal standard.  We find that he did, and thus did not err in finding that only Henderson's depression and disc degeneration were severe impairments.

*c. Did the ALJ err by not including the bases for his decision?*

Third, Henderson argues that the ALJ erred in assessing the severity of her mental impairment by not including any discussion of the bases for his conclusion.  He determined that "[i]n activities of daily living, the claimant has mild restrictions[,]" no difficulties in social functioning, and "moderate difficulties" in the area of "concentration, persistence or pace[.]"  Specifically, Henderson argues that the ALJ's findings were in error because they were contrary to the level of limitations to which she testified.  This argument is unpersuasive. The ALJ expressly considered the criteria of mental impairment listings.  *See* 20 C.F.R. Pt. 404, subpt. P app. 1 ¶ 12.04.  Further, questions of credibility concerning pain are within the ALJ's discretion. *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) (per curiam) ("The ALJ did not err in discounting [claimant's] subjective complaints of pain as inconsistent with other evidence in the record, including the findings of physicians. The ALJ must

consider the subjective evidence of pain, but it is within his discretion to determine the pain's disabling nature." (internal quotation marks omitted)).

Here, the ALJ outlined the seven factors that he was required to consider, in addition to objective medical evidence, when assessing the credibility of a claimant. As discussed above, the ALJ did not err in determining that Henderson's reports about the intensity, persistence, and limiting effects of her symptoms were not credible. He noted that medical examinations revealed full muscle strength, intact sensations and reflexes, and normal gait and balance. She had occasionally ceased taking pain medications on her own. A residual functional capacity evaluation report noted that Henderson had demonstrated inconsistent effort. He noted that Henderson had reported taking care of a pet, going out to eat, driving, making her bed, bathing, doing chores, dating, and traveling occasionally to Shreveport. Additionally, the ALJ noted that he discounted Henderson's daughter's testimony because it was vague, did not contain dates, and contradicted Henderson's own testimony. Ultimately, as Henderson's account of her limitations conflicted with both the state agency medical consultants and the medical experts, the ALJ was well within his discretion to afford her testimony little credibility.

*d. Did the ALJ err in determining Henderson's mental residual functional capacity?*

Finally, Henderson argues that the ALJ erred in determining Henderson's mental residual functional capacity. Specifically, Henderson claims he disregarded evidence from Dr. Mount without a proper basis. As discussed above, *see supra* III.B.1.(a)., the ALJ did not err in affording little weight to Dr. Mount, a non-treating physician whose opinions contradicted other medical evidence and testimony. *See* 20 C.F.R. § 404.1527(c). The opinion of an examining doctor must be considered, but need not be given controlling weight. *Id.*

No. 12-40578

To the extent that Henderson claims on appeal that the ALJ erred in only ruling out her ability to complete complex tasks without accounting for her "moderate limitations of concentration, persistence, or pace," that argument is waived because Henderson failed to raise it before the district court. *See City of Dall. v. Hall*, 562 F.3d 712, 723–24 (5th Cir. 2009).

### 2. Whether the ALJ erred in discounting Henderson's credibility

Henderson's second point of error is that the ALJ erred in discounting her credibility. As discussed above, *see supra* III.B.1.(a) and (c), the ALJ adequately supported his determination that Henderson's allegations of her limitations were not entirely credible.

Ultimately, Henderson cannot meet her burden to establish that the Commissioner's decision applied the wrong legal standard or that the decision is not supported by substantial evidence.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgment affirming the Commissioner's decision.